MILLER, SUPERINTENDENT, PENDLETON COR-
RECTIONAL FACILITY, ET AL. *v.* FRENCH ET AL.

No. 99–224.   Argued April 18, 2000—Decided June 19, 2000*

---

*Together with No. 99–582, *United States* v. *French et al.*, also on cer-
tiorari to the same court.

328

O'CONNOR, J., delivered the opinion of the Court, in which REHN-QUIST, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined, and in which SOUTER and GINSBURG, JJ., joined as to Parts I and II. SOUTER, J., filed an opinion concurring in part and dissenting in part, in which GINSBURG, J., joined, *post*, p. 350. BREYER, J., filed a dissenting opinion, in which STEVENS, J., joined, *post*, p. 353.

*Jon Laramore,* Deputy Attorney General of Indiana, argued the cause for petitioners in No. 99–224. With him on the briefs were *Karen M. Freeman-Wilson,* Attorney General, *Jeffrey A. Modisett,* former Attorney General, and *Wayne E. Uhl* and *Geoffrey G. Slaughter,* Deputy Attorneys General.

*Deputy Solicitor General Underwood* argued the cause for the United States in No. 99–582. With her on the briefs were *Solicitor General Waxman, Acting Assistant Attorney General Lee, Irving L. Gornstein,* and *Mark L. Gross.*

*Kenneth J. Falk* argued the cause for respondents in both cases. With him on the brief were *Jacquelyn E. Bowie, Hamid R. Kashani, Steven R. Shapiro,* and *Elizabeth Alexander.*†

---

†Briefs of *amici curiae* urging reversal were filed for the State of Texas et al. by *John Cornyn,* Attorney General of Texas, *Andy Taylor,* First Assistant Attorney General, *Shane Phelps,* Deputy Attorney General, *Gregory S. Coleman,* Solicitor General, *Charles K. Eldred,* Assistant Attorney General, and *Robert Rigsby,* Acting Corporation Counsel of the District of Columbia, and by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Bruce M. Botelho* of Alaska, *Robert A. Russell, Jr.,* of Arkansas, *Bill Lockyer* of California, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *James E. Ryan* of Illinois, *Carla J. Stovall* of Kansas, *J. Joseph Curran, Jr.,* of Maryland, *Jennifer M. Granholm* of Michigan, *Mike Moore* of Mississippi, *Jeremiah W. (Jay) Nixon* of Missouri, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Philip T. McLaughlin* of New Hampshire, *John J. Farmer, Jr.,* of New Jersey, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *D. Michael Fisher* of Pennsylvania, *Charlie Condon* of South Carolina, *Mark Barnett* of South Dakota, *Paul G. Summers* of Tennessee, *Jan Graham* of Utah, *Christine O. Gregoire* of Washington, and *Gay Woodhouse* of Wyoming; for Americans for Effective Law Enforcement, Inc., et al. by *Wayne W. Schmidt, Bernard J. Farber, James P. Manak,* and *Richard Weintraub;* for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson;* for the National Governors' Association et al. by *Richard Ruda* and *James I. Crowley;* and for the Washington Legal Foundation et al. by *Paul D. Clement, Daniel J. Popeo,* and *R. Shawn Gunnarson.*

Briefs of *amici curiae* urging affirmance were filed for Public Citizen by *Alan B. Morrison* and *David C. Vladeck;* for Arizona State Prison

JUSTICE O'CONNOR delivered the opinion of the Court.

The Prison Litigation Reform Act of 1995 (PLRA) establishes standards for the entry and termination of prospective relief in civil actions challenging prison conditions. §§ 801–810, 110 Stat. 1321–66 to 1321–77. If prospective relief under an existing injunction does not satisfy these standards, a defendant or intervenor is entitled to "immediate termination" of that relief. 18 U. S. C. § 3626(b)(2) (1994 ed., Supp. IV). And under the PLRA's "automatic stay" provision, a motion to terminate prospective relief "shall operate as a stay" of that relief during the period beginning 30 days after the filing of the motion (extendable to up to 90 days for "good cause") and ending when the court rules on the motion. §§ 3626(e)(2), (3). The superintendent of Indiana's Pendleton Correctional Facility, which is currently operating under an ongoing injunction to remedy violations of the Eighth Amendment regarding conditions of confinement, filed a motion to terminate prospective relief under the PLRA. Respondent prisoners moved to enjoin the operation of the automatic stay provision of § 3626(e)(2), arguing that it is unconstitutional. The District Court enjoined the stay, and the Court of Appeals for the Seventh Circuit affirmed. We must decide whether a district court may enjoin the operation of the PLRA's automatic stay provision and, if not, whether that provision violates separation of powers principles.

## I

### A

This litigation began in 1975, when four inmates at what is now the Pendleton Correctional Facility brought a class

System Inmates by *John P. Frank;* and for Erwin Chemerinsky et al. by *Mr. Chemerinsky, pro se.*

*Sarah B. Vandenbraak, Michael D. Hess, Leonard J. Koerner,* and *Lorna B. Goodman* filed a brief for the Association of State Correctional Administrators et al. as *amici curiae.*

action under Rev. Stat. §1979, 42 U. S. C. §1983, on behalf of all persons who were, or would be, confined at the facility against the predecessors in office of petitioners (hereinafter State). 1 Record, Doc. No. 1, p. 2. After a trial, the District Court found that living conditions at the prison violated both state and federal law, including the Eighth Amendment's prohibition against cruel and unusual punishment, and the court issued an injunction to correct those violations. *French* v. *Owens*, 538 F. Supp. 910 (SD Ind. 1982), aff'd in part, vacated and remanded in part, 777 F. 2d 1250 (CA7 1985). While the State's appeal was pending, this Court decided *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89 (1984), which held that the Eleventh Amendment deprives federal courts of jurisdiction over claims for injunctive relief against state officials based on state law. Accordingly, the Court of Appeals for the Seventh Circuit remanded the action to the District Court for reconsideration. 777 F. 2d, at 1251. On remand, the District Court concluded that most of the state law violations also ran afoul of the Eighth Amendment, and it issued an amended remedial order to address those constitutional violations. The order also accounted for improvements in living conditions at the Pendleton facility that had occurred in the interim. *Ibid.*

The Court of Appeals affirmed the amended remedial order as to those aspects governing overcrowding and double celling, the use of mechanical restraints, staffing, and the quality of food and medical services, but it vacated those portions pertaining to exercise and recreation, protective custody, and fire and occupational safety standards. *Id.*, at 1258. This ongoing injunctive relief has remained in effect ever since, with the last modification occurring in October 1988, when the parties resolved by joint stipulation the remaining issues related to fire and occupational safety standards. 1 Record, Doc. No. 14.

## B

In 1996, Congress enacted the PLRA. As relevant here, the PLRA establishes standards for the entry and termination of prospective relief in civil actions challenging conditions at prison facilities. Specifically, a court "shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U. S. C. § 3626(a)(1)(A) (1994 ed., Supp. IV). The same criteria apply to existing injunctions, and a defendant or intervenor may move to terminate prospective relief that does not meet this standard. See § 3626(b)(2). In particular, § 3626(b)(2) provides:

> "In any civil action with respect to prison conditions, a defendant or intervener shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."

A court may not terminate prospective relief, however, if it "makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means necessary to correct the violation." § 3626(b)(3). The PLRA also requires courts to rule "promptly" on motions to terminate prospective relief, with mandamus available to remedy a court's failure to do so. § 3626(e)(1).

Finally, the provision at issue here, § 3626(e)(2), dictates that, in certain circumstances, prospective relief shall be

stayed pending resolution of a motion to terminate. Specifically, subsection (e)(2), entitled "Automatic Stay," states:

> "Any motion to modify or terminate prospective relief made under subsection (b) shall operate as a stay during the period—
> "(A)(i) beginning on the 30th day after such motion is filed, in the case of a motion made under paragraph (1) or (2) of subsection (b); . . .
> "(ii) . . . and
> "(B) ending on the date the court enters a final order ruling on the motion."

As one of several 1997 amendments to the PLRA, Congress permitted courts to postpone the entry of the automatic stay for not more than 60 days for "good cause," which cannot include general congestion of the court's docket. § 123, 111 Stat. 2470, codified at 18 U. S. C. § 3626(e)(3).*

### C

On June 5, 1997, the State filed a motion under § 3626(b) to terminate the prospective relief governing the conditions of confinement at the Pendleton Correctional Facility. 1 Record, Doc. No. 16. In response, the prisoner class moved for a temporary restraining order or preliminary injunction to enjoin the operation of the automatic stay, arguing that § 3626(e)(2) is unconstitutional as both a violation of the Due Process Clause of the Fifth Amendment and separation of powers principles. The District Court granted

---

*As originally enacted, § 3626(e)(2) provided that "[a]ny prospective relief subject to a pending motion [for termination] shall be automatically stayed during the period . . . beginning on the 30th day after such motion is filed . . . and ending on the date the court enters a final order ruling on the motion." § 802, 110 Stat. 1321–68 to 1321–69. The 1997 amendments to the PLRA revised the automatic stay provision to its current form, and Congress specified that the 1997 amendments "shall apply to pending cases." 18 U. S. C. § 3626 note (1994 ed., Supp. IV).

the prisoners' motion, enjoining the automatic stay. See *id.*, Doc. No. 23; see also *French* v. *Duckworth*, 178 F. 3d 437, 440–441 (CA7 1999). The State appealed, and the United States intervened pursuant to 28 U. S. C. § 2403(a) to defend the constitutionality of § 3626(e)(2).

The Court of Appeals for the Seventh Circuit affirmed the District Court's order, concluding that although § 3626(e)(2) precluded courts from exercising their equitable powers to enjoin operation of the automatic stay, the statute, so construed, was unconstitutional on separation of powers grounds. See 178 F. 3d, at 447–448. The court reasoned that Congress drafted § 3626(e)(2) in unequivocal terms, clearly providing that a motion to terminate under § 3626(b)(2) *"shall operate"* as a stay during a specified time period. *Id.*, at 443. While acknowledging that courts should not lightly assume that Congress meant to restrict the equitable powers of the federal courts, the Court of Appeals found "it impossible to read this language as doing anything less than that." *Ibid.* Turning to the constitutional question, the court characterized § 3626(e)(2) as "a self-executing legislative determination that a specific decree of a federal court . . . must be set aside at least for a period of time." *Id.*, at 446. As such, it concluded that § 3626(e)(2) directly suspends a court order in violation of the separation of powers doctrine under *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211 (1995), and mandates a particular rule of decision, at least during the pendency of the § 3626(b)(2) termination motion, contrary to *United States* v. *Klein*, 13 Wall. 128 (1872). See 178 F. 3d, at 446. Having concluded that § 3626(e)(2) is unconstitutional on separation of powers grounds, the Court of Appeals did not reach the prisoners' due process claims. Over the dissent of three judges, the court denied rehearing en banc. See *id.*, at 448–453 (Easterbrook, J., dissenting from denial of rehearing en banc).

We granted certiorari, 528 U. S. 1045 (1999), to resolve a conflict among the Courts of Appeals as to whether

§ 3626(e)(2) permits federal courts, in the exercise of their traditional equitable authority, to enjoin operation of the PLRA's automatic stay provision and, if not, to review the Court of Appeals' judgment that § 3626(e)(2), so construed, is unconstitutional. Compare *Ruiz* v. *Johnson*, 178 F. 3d 385 (CA5 1999) (holding that district courts retain the equitable discretion to suspend the automatic stay and that § 3626(e)(2) is therefore constitutional); *Hadix* v. *Johnson*, 144 F. 3d 925 (CA6 1998) (same), with 178 F. 3d 437 (CA7 1999) (case below).

## II

We address the statutory question first. Both the State and the prisoner class agree, as did the majority and dissenting judges below, that § 3626(e)(2) precludes a district court from exercising its equitable powers to enjoin the automatic stay. The Government argues, however, that § 3626(e)(2) should be construed to leave intact the federal courts' traditional equitable discretion to "stay the stay," invoking two canons of statutory construction. First, the Government contends that we should not interpret a statute as displacing courts' traditional equitable authority to preserve the status quo pending resolution on the merits "[a]bsent the clearest command to the contrary." *Califano* v. *Yamasaki*, 442 U. S. 682, 705 (1979). Second, the Government asserts that reading § 3626(e)(2) to remove that equitable power would raise serious separation of powers questions, and therefore should be avoided under the canon of constitutional doubt. Like the Court of Appeals, we do not lightly assume that Congress meant to restrict the equitable powers of the federal courts, and we agree that constitutionally doubtful constructions should be avoided where "fairly possible." *Communications Workers* v. *Beck*, 487 U. S. 735, 762 (1988). But where Congress has made its intent clear, "we must give effect to that intent." *Sinclair Refining Co.* v. *Atkinson*, 370 U. S. 195, 215 (1962).

The text of §3626(e)(2) provides that "[a]ny motion to . . . terminate prospective relief made under subsection (b) *shall operate as a stay*" during a fixed period of time, *i. e.*, from 30 (or 90) days after the motion is filed until the court enters a final order ruling on the motion. 18 U. S. C. §3626(e)(2) (1994 ed., Supp. IV) (emphasis added). The stay is "automatic" once a state defendant has filed a §3626(b) motion, and the statutory command that such a motion "shall operate as a stay during the [specified time] period" indicates that the stay is *mandatory* throughout that period of time. See *Lexecon Inc.* v. *Milberg Weiss Bershad Hynes & Lerach,* 523 U. S. 26, 35 (1998) ("[T]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion").

Nonetheless, the Government contends that reading the statute to preserve courts' traditional equitable powers to enter appropriate injunctive relief is consistent with this text because, in its view, §3626(e)(2) is simply a burden-shifting mechanism. That is, the purpose of the automatic stay provision is merely to relieve defendants of the burden of establishing the prerequisites for a stay and to eliminate courts' discretion to deny a stay, even if those prerequisites are established, based on the public interest or hardship to the plaintiffs. Thus, under this reading, nothing in §3626(e)(2) prevents courts from subsequently suspending the automatic stay by applying the traditional standards for injunctive relief.

Such an interpretation, however, would subvert the plain meaning of the statute, making its mandatory language merely permissive. Section 3626(e)(2) states that a motion to terminate prospective relief "*shall operate* as a stay *during*" the specified time period from 30 (or 90) days after the filing of the §3626(b) motion *until* the court rules on that motion. (Emphasis added.) Thus, not only does the statute employ the mandatory term "shall," but it also specifies the points at which the operation of the stay is to begin and end. In other words, contrary to JUSTICE BREYER's suggestion

that the language of § 3626(e)(2) "says nothing . . . about the district court's power to modify or suspend the operation of the 'stay,'" *post,* at 358 (dissenting opinion), § 3626(e)(2) unequivocally mandates that the stay "shall operate *during*" this specific interval. To allow courts to exercise their equitable discretion to prevent the stay from "operating" during this statutorily prescribed period would be to contradict § 3626(e)(2)'s plain terms. It would mean that the motion to terminate merely *may* operate as a stay, despite the statute's command that it "shall" have such effect. If Congress had intended to accomplish nothing more than to relieve state defendants of the burden of establishing the prerequisites for a stay, the language of § 3626(e)(2) is, at best, an awkward and indirect means to achieve that result.

Viewing the automatic stay provision in the context of § 3626 as a whole further confirms that Congress intended to prohibit federal courts from exercising their equitable authority to suspend operation of the automatic stay. The specific appeal provision contained in § 3626(e) states that "[a]ny order staying, suspending, delaying, or barring the operation of the automatic stay" of § 3626(e)(2) "shall be appealable" pursuant to 28 U. S. C. § 1292(a)(1). § 3626(e)(4). At first blush, this provision might be read as supporting the view that Congress expressly recognized the possibility that a district court could exercise its equitable discretion to enjoin the stay. The two Courts of Appeals that have construed § 3626(e)(2) as preserving the federal courts' equitable powers have reached that conclusion based on this reading of § 3626(e)(4). See *Ruiz* v. *Johnson,* 178 F. 3d, at 394; *Hadix* v. *Johnson,* 144 F. 3d, at 938. They reasoned that Congress would not have provided for expedited review of such orders had it not intended that district courts would retain the power to enter the orders in the first place. See *ibid.* In other words, "Congress understood that there would be some cases in which a conscientious district court acting in good faith would perceive that equity required that it suspend"

the § 3626(e)(2) stay, and "Congress therefore permitted the district court to do so, subject to appellate review." *Ruiz* v. *Johnson, supra,* at 394.

The critical flaw in this construction, however, is that § 3626(e)(4) only provides for an appeal from an order *preventing* the operation of the automatic stay. § 3626(e)(4) ("Any order staying, suspending, delaying, or barring the operation of the automatic stay" under § 3626(e)(2) "shall be appealable"). If the rationale for the provision were that in some situations equity demands that the automatic stay be suspended, then presumably the *denial* of a motion to enjoin the stay should also be appealable. The one-way nature of the appeal provision only makes sense if the automatic stay is required to operate during a specific time period, such that any attempt by a district court to circumvent the mandatory stay is immediately reviewable.

The Government contends that if Congress' goal were to prevent courts from circumventing the PLRA's plain commands, mandamus would have been a more appropriate remedy than appellate review. But that proposition is doubtful, as mandamus is an extraordinary remedy that is "granted only in the exercise of sound discretion." *Whitehouse* v. *Illinois Central R. Co.,* 349 U. S. 366, 373 (1955). Given that curbing the equitable discretion of district courts was one of the PLRA's principal objectives, it would have been odd for Congress to have left enforcement of § 3626(e)(2) to that very same discretion. Instead, Congress sensibly chose to make available an immediate appeal to resolve situations in which courts mistakenly believe—under the novel scheme created by the PLRA—that they have the authority to enjoin the automatic stay, rather than the extraordinary remedy of mandamus, which requires a showing of a "clear and indisputable" right to the issuance of the writ. See *Mallard* v. *United States Dist. Court for Southern Dist. of Iowa,* 490 U. S. 296, 309 (1989). In any event, § 3626(e) as originally enacted did not provide for interlocutory review. It was

only after some courts refused to enter the automatic stay, and after the Court of Appeals for the Fifth Circuit would not review such a refusal, that Congress amended § 3626(e) to provide for interlocutory review. See *In re Scott,* 163 F. 3d 282, 284 (CA5 1998); *Ruiz* v. *Johnson, supra,* at 388; see also 18 U. S. C. § 3626(e)(4) (1994 ed., Supp. IV).

Finally, the Government finds support for its view in § 3626(e)(3). That provision authorizes an extension, for "good cause," of the starting point for the automatic stay, from 30 days after the § 3626(b) motion is filed until 90 days after that motion is filed. The Government explains that, by allowing the court to prevent the entry of the stay for up to 60 days under the relatively generous "good cause" standard, Congress by negative implication has preserved courts' discretion to suspend the stay *after* that time under the more stringent standard for injunctive relief. To be sure, allowing a delay in entry of the stay for 60 days based on a good cause standard does not by itself necessarily imply that any other reason for preventing the operation of the stay—for example, on the basis of traditional equitable principles—is precluded. But § 3626(e)(3) cannot be read in isolation. When §§ 3626(e)(2) and (3) are read together, it is clear that the district court cannot enjoin the operation of the automatic stay. The § 3626(b) motion "shall operate as a stay during" a specific time period. Section 3626(e)(3) only adjusts the starting point for the stay, and it merely permits that starting point to be delayed. Once the 90-day period has passed, the § 3626(b) motion "shall operate as a stay" until the court rules on the § 3626(b) motion. During that time, any attempt to enjoin the stay is irreconcilable with the plain language of the statute.

Thus, although we should not construe a statute to displace courts' traditional equitable authority absent the "clearest command," *Califano* v. *Yamasaki,* 442 U. S., at 705, or an "inescapable inference" to the contrary, *Porter* v. *Warner Holding Co.,* 328 U. S. 395, 398 (1946), we are con-

vinced that Congress' intent to remove such discretion is unmistakable in § 3626(e)(2). And while this construction raises constitutional questions, the canon of constitutional doubt permits us to avoid such questions only where the saving construction is not "plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council,* 485 U. S. 568, 575 (1988). "We cannot press statutory construction 'to the point of disingenuous evasion' even to avoid a constitutional question." *United States* v. *Locke,* 471 U. S. 84, 96 (1985) (quoting *George Moore Ice Cream Co.* v. *Rose,* 289 U. S. 373, 379 (1933)); see also *Pennsylvania Dept. of Corrections* v. *Yeskey,* 524 U. S. 206, 212 (1998) (constitutional doubt canon does not apply where the statute is unambiguous); *Commodity Futures Trading Comm'n* v. *Schor,* 478 U. S. 833, 841 (1986) (constitutional doubt canon "does not give a court the prerogative to ignore the legislative will"). Like the Court of Appeals, we find that § 3626(e)(2) is unambiguous, and accordingly, we cannot adopt JUSTICE BREYER's "more flexible interpretation" of the statute. *Post,* at 355. Any construction that preserved courts' equitable discretion to enjoin the automatic stay would effectively convert the PLRA's mandatory stay into a discretionary one. Because this would be plainly contrary to Congress' intent in enacting the stay provision, we must confront the constitutional issue.

### III

The Constitution enumerates and separates the powers of the three branches of Government in Articles I, II, and III, and it is this "very structure" of the Constitution that exemplifies the concept of separation of powers. *INS* v. *Chadha,* 462 U. S. 919, 946 (1983). While the boundaries between the three branches are not "'hermetically' sealed," see *id.,* at 951, the Constitution prohibits one branch from encroaching on the central prerogatives of another, see *Loving* v. *United States,* 517 U. S. 748, 757 (1996); *Buckley* v.

*Valeo,* 424 U. S. 1, 121–122 (1976) *(per curiam).* The powers of the Judicial Branch are set forth in Article III, §1, which states that the "judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish," and provides that these federal courts shall be staffed by judges who hold office during good behavior, and whose compensation shall not be diminished during tenure in office. As we explained in *Plaut* v. *Spendthrift Farm, Inc.,* 514 U. S., at 218–219, Article III "gives the Federal Judiciary the power, not merely to rule on cases, but to *decide* them, subject to review only by superior courts in the Article III hierarchy."

Respondent prisoners contend that §3626(e)(2) encroaches on the central prerogatives of the Judiciary and thereby violates the separation of powers doctrine. It does this, the prisoners assert, by legislatively suspending a final judgment of an Article III court in violation of *Plaut* and *Hayburn's Case,* 2 Dall. 409 (1792). According to the prisoners, the remedial order governing living conditions at the Pendleton Correctional Facility is a final judgment of an Article III court, and §3626(e)(2) constitutes an impermissible usurpation of judicial power because it commands the district court to suspend prospective relief under that order, albeit temporarily. An analysis of the principles underlying *Hayburn's Case* and *Plaut,* as well as an examination of §3626(e)(2)'s interaction with the other provisions of §3626, makes clear that §3626(e)(2) does not offend these separation of powers principles.

*Hayburn's Case* arose out of a 1792 statute that authorized pensions for veterans of the Revolutionary War. See Act of Mar. 23, 1792, ch. 11, 1 Stat. 243. The statute provided that the circuit courts were to review the applications and determine the appropriate amount of the pension, but that the Secretary of War had the discretion either to adopt or reject the courts' findings. *Hayburn's Case, supra,* at 408–410.

Although this Court did not reach the constitutional issue in *Hayburn's Case*, the statements of five Justices, acting as circuit judges, were reported, and we have since recognized that the case "stands for the principle that Congress cannot vest review of the decisions of Article III courts in officials of the Executive Branch." *Plaut, supra*, at 218; see also *Morrison* v. *Olson*, 487 U. S. 654, 677, n. 15 (1988). As we recognized in *Plaut*, such an effort by a coequal branch to "annul a final judgment" is "'an assumption of Judicial power' and therefore forbidden." 514 U. S., at 224 (quoting *Bates* v. *Kimball*, 2 Chipman 77 (Vt. 1824)).

Unlike the situation in *Hayburn's Case*, § 3626(e)(2) does not involve the direct review of a judicial decision by officials of the Legislative or Executive Branches. Nonetheless, the prisoners suggest that § 3626(e)(2) falls within *Hayburn's* prohibition against an indirect legislative "suspension" or reopening of a final judgment, such as that addressed in *Plaut*. See *Plaut, supra*, at 226 (quoting *Hayburn's Case, supra*, at 413 (letter of Iredell, J., and Sitgreaves, D. J.) ("'[N]o decision of any court of the United States can, under any circumstances, . . . be liable to a revision, or even suspension, by the [l]egislature itself, in whom no judicial power of any kind appears to be vested'")). In *Plaut*, we held that a federal statute that required federal courts to reopen final judgments that had been entered before the statute's enactment was unconstitutional on separation of powers grounds. 514 U. S., at 211. The plaintiffs had brought a civil securities fraud action seeking money damages. *Id.*, at 213. While that action was pending, we ruled in *Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson*, 501 U. S. 350 (1991), that such suits must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation. In light of this intervening decision, the *Plaut* plaintiffs' suit was untimely, and the District Court accordingly dismissed the action as time barred. *Plaut, supra*, at 214. After the judgment dismissing the

case had become final, Congress enacted a statute providing for the reinstatement of those actions, including the *Plaut* plaintiffs', that had been dismissed under *Lampf* but that would have been timely under the previously applicable statute of limitations. 514 U. S., at 215.

We concluded that this retroactive command that federal courts reopen final judgments exceeded Congress' authority. *Id.*, at 218–219. The decision of an inferior court within the Article III hierarchy is not the final word of the department (unless the time for appeal has expired), and "[i]t is the obligation of the last court in the hierarchy that rules on the case to give effect to Congress's latest enactment, even when that has the effect of overturning the judgment of an inferior court, since each court, at every level, must 'decide according to existing laws.'" *Id.*, at 227 (quoting *United States* v. *Schooner Peggy*, 1 Cranch 103, 109 (1801)). But once a judicial decision achieves finality, it "becomes the last word of the judicial department." 514 U. S., at 227. And because Article III "gives the Federal Judiciary the power, not merely to rule on cases, but to *decide* them, subject to review only by superior courts in the Article III hierarchy," *id.*, at 218–219, the "judicial Power is one to render dispositive judgments," and Congress cannot retroactively command Article III courts to reopen final judgments, *id.*, at 219 (quoting Easterbrook, Presidential Review, 40 Case W. Res. L. Rev. 905, 926 (1990) (internal quotation marks omitted)).

*Plaut,* however, was careful to distinguish the situation before the Court in that case—legislation that attempted to reopen the dismissal of a suit seeking money damages—from legislation that "altered the prospective effect of injunctions entered by Article III courts." 514 U. S., at 232. We emphasized that "nothing in our holding today calls . . . into question" Congress' authority to alter the prospective effect of previously entered injunctions. *Ibid.* Prospective relief under a continuing, executory decree remains subject to alteration due to changes in the underlying law. Cf. *Land-*

*graf* v. *USI Film Products,* 511 U. S. 244, 273 (1994) ("When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive"). This conclusion follows from our decisions in *Pennsylvania* v. *Wheeling & Belmont Bridge Co.,* 13 How. 518 (1852) *(Wheeling Bridge I),* and *Pennsylvania* v. *Wheeling & Belmont Bridge Co.,* 18 How. 421 (1856) *(Wheeling Bridge II).*

In *Wheeling Bridge I,* we held that a bridge across the Ohio River, because it was too low, unlawfully "obstruct[ed] the navigation of the Ohio," and ordered that the bridge be raised or permanently removed. 13 How., at 578. Shortly thereafter, Congress enacted legislation declaring the bridge to be a "lawful structur[e]," establishing the bridge as a "'post-roa[d] for the passage of the mails of the United States,'" and declaring that the Wheeling and Belmont Bridge Company was authorized to maintain the bridge at its then-current site and elevation. *Wheeling Bridge II, supra,* at 429. After the bridge was destroyed in a storm, Pennsylvania sued to enjoin the bridge's reconstruction, arguing that the statute legalizing the bridge was unconstitutional because it effectively annulled the Court's decision in *Wheeling Bridge I.* We rejected that argument, concluding that the decree in *Wheeling Bridge I* provided for ongoing relief by "directing the abatement of the obstruction" which enjoined the defendants' from any continuance or reconstruction of the obstruction. Because the intervening statute altered the underlying law such that the bridge was no longer an unlawful obstruction, we held that it was "quite plain the decree of the court cannot be enforced." *Wheeling Bridge II, supra,* at 431–432. The Court explained that had *Wheeling Bridge I* awarded money damages in an action at law, then that judgment would be final, and Congress' later action could not have affected plaintiff's right to those damages. See 18 How., at 431. But because the decree entered in *Wheeling Bridge I* provided for prospec-

tive relief—a continuing injunction against the continuation or reconstruction of the bridge—the ongoing validity of the injunctive relief depended on "whether or not [the bridge] interferes with the right of navigation." 18 How., at 431. When Congress altered the underlying law such that the bridge was no longer an unlawful obstruction, the injunction against the maintenance of the bridge was not enforceable. See *id.*, at 432.

Applied here, the principles of *Wheeling Bridge II* demonstrate that the automatic stay of § 3626(e)(2) does not unconstitutionally "suspend" or reopen a judgment of an Article III court. Section 3626(e)(2) does not by itself "tell judges when, how, or what to do." 178 F. 3d, at 449 (Easterbrook, J., dissenting from denial of rehearing en banc). Instead, § 3626(e)(2) merely reflects the change implemented by § 3626(b), which does the "heavy lifting" in the statutory scheme by establishing new standards for prospective relief. See *Berwanger* v. *Cottey*, 178 F. 3d 834, 839 (CA7 1999). Section 3626 prohibits the continuation of prospective relief that was "approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means to correct the violation," § 3626(b)(2), or in the absence of "findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of a Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation," § 3626(b)(3). Accordingly, if prospective relief under an existing decree had been granted or approved absent such findings, then that prospective relief must cease, see § 3626(b)(2), unless and until the court makes findings on the record that such relief remains necessary to correct an ongoing violation and is narrowly tailored, see § 3626(b)(3). The PLRA's automatic stay provision assists in the enforce-

ment of §§3626(b)(2) and (3) by requiring the court to stay any prospective relief that, due to the change in the underlying standard, is no longer enforceable, *i. e.*, prospective relief that is not supported by the findings specified in §§3626(b)(2) and (3).

By establishing new standards for the enforcement of prospective relief in §3626(b), Congress has altered the relevant underlying law. The PLRA has restricted courts' authority to issue and enforce prospective relief concerning prison conditions, requiring that such relief be supported by findings and precisely tailored to what is needed to remedy the violation of a federal right. See *Benjamin* v. *Jacobson,* 172 F. 3d 144, 163 (CA2 1999) (en banc); *Imprisoned Citizens Union* v. *Ridge,* 169 F. 3d 178, 184–185 (CA3 1999); *Tyler* v. *Murphy,* 135 F. 3d 594, 597 (CA8 1998); *Inmates of Suffolk County Jail* v. *Rouse,* 129 F. 3d 649, 657 (CA1 1997). We note that the constitutionality of §3626(b) is not challenged here; we assume, without deciding, that the new standards it pronounces are effective. As *Plaut* and *Wheeling Bridge II* instruct, when Congress changes the law underlying a judgment awarding prospective relief, that relief is no longer enforceable to the extent it is inconsistent with the new law. Although the remedial injunction here is a "final judgment" for purposes of appeal, it is not the "last word of the judicial department." *Plaut,* 514 U. S., at 227. The provision of prospective relief is subject to the continuing supervisory jurisdiction of the court, and therefore may be altered according to subsequent changes in the law. See *Rufo* v. *Inmates of Suffolk County Jail,* 502 U. S. 367, 388 (1992). Prospective relief must be "modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law." *Ibid.;* see also *Railway Employees* v. *Wright,* 364 U. S. 642, 646–647 (1961) (a court has the authority to alter the prospective effect of an injunction to reflect a change in circumstances, whether of law or fact, that has occurred since the injunction was

entered); *Lauf* v. *E. G. Shinner & Co.*, 303 U.S. 323, 329 (1938) (applying the Norris-LaGuardia Act's prohibition on a district court's entry of injunctive relief in the absence of findings).

The entry of the automatic stay under § 3626(e)(2) helps to implement the change in the law caused by §§ 3626(b)(2) and (3). If the prospective relief under the existing decree is not supported by the findings required under § 3626(b)(2), and the court has not made the findings required by § 3626(b)(3), then prospective relief is no longer enforceable and must be stayed. The entry of the stay does not reopen or "suspend" the previous judgment, nor does it divest the court of authority to decide the merits of the termination motion. Rather, the stay merely reflects the changed legal circumstances—that prospective relief under the existing decree is no longer enforceable, and remains unenforceable unless and until the court makes the findings required by § 3626(b)(3).

For the same reasons, § 3626(e)(2) does not violate the separation of powers principle articulated in *United States* v. *Klein*, 13 Wall. 128 (1872). In that case, Klein, the executor of the estate of a Confederate sympathizer, sought to recover the value of property seized by the United States during the Civil War, which by statute was recoverable if Klein could demonstrate that the decedent had not given aid or comfort to the rebellion. See *id.*, at 131. In *United States* v. *Padelford*, 9 Wall. 531, 542–543 (1870), we held that a Presidential pardon satisfied the burden of proving that no such aid or comfort had been given. While Klein's case was pending, Congress enacted a statute providing that a pardon would instead be taken as proof that the pardoned individual had in fact aided the enemy, and if the claimant offered proof of a pardon the court must dismiss the case for lack of jurisdiction. *Klein*, 13 Wall., at 133–134. We concluded that the statute was unconstitutional because it purported to "pre-

scribe rules of decision to the Judicial Department of the government in cases pending before it." *Id.*, at 146.

Here, the prisoners argue that Congress has similarly prescribed a rule of decision because, for the period of time until the district court makes a final decision on the merits of the motion to terminate prospective relief, § 3626(e)(2) mandates a particular outcome: the termination of prospective relief. As we noted in *Plaut*, however, "[w]hatever the precise scope of *Klein*, . . . later decisions have made clear that its prohibition does not take hold when Congress 'amend[s] applicable law.'" 514 U. S., at 218 (quoting *Robertson* v. *Seattle Audubon Soc.*, 503 U. S. 429, 441 (1992)). The prisoners concede this point but contend that, because § 3626(e)(2) does not itself amend the legal standard, *Klein* is still applicable. As we have explained, however, § 3626(e)(2) must be read not in isolation, but in the context of § 3626 as a whole. Section 3626(e)(2) operates in conjunction with the new standards for the continuation of prospective relief; if the new standards of § 3626(b)(2) are not met, then the stay "shall operate" unless and until the court makes the findings required by § 3626(b)(3). Rather than prescribing a rule of decision, § 3626(e)(2) simply imposes the consequences of the court's application of the new legal standard.

Finally, the prisoners assert that, even if § 3626(e)(2) does not fall within the recognized prohibitions of *Hayburn's Case, Plaut,* or *Klein,* it still offends the principles of separation of powers because it places a deadline on judicial decisionmaking, thereby interfering with core judicial functions. Congress' imposition of a time limit in § 3626(e)(2), however, does not in itself offend the structural concerns underlying the Constitution's separation of powers. For example, if the PLRA granted courts 10 years to determine whether they could make the required findings, then certainly the PLRA would raise no apprehensions that Congress had encroached on the core function of the Judiciary to decide "cases and controversies properly before them." *United*

*States* v. *Raines*, 362 U. S. 17, 20 (1960). Respondents' concern with the time limit, then, must be its relative brevity. But whether the time is so short that it deprives litigants of a meaningful opportunity to be heard is a due process question, an issue that is not before us. We leave open, therefore, the question whether this time limit, particularly in a complex case, may implicate due process concerns.

In contrast to due process, which principally serves to protect the personal rights of litigants to a full and fair hearing, separation of powers principles are primarily addressed to the structural concerns of protecting the role of the independent Judiciary within the constitutional design. In this action, we have no occasion to decide whether there could be a time constraint on judicial action that was so severe that it implicated these structural separation of powers concerns. The PLRA does not deprive courts of their adjudicatory role, but merely provides a new legal standard for relief and encourages courts to apply that standard promptly.

Through the PLRA, Congress clearly intended to make operation of the automatic stay mandatory, precluding courts from exercising their equitable powers to enjoin the stay. And we conclude that this provision does not violate separation of powers principles. Accordingly, the judgment of the Court of Appeals for the Seventh Circuit is reversed, and the action is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SOUTER, with whom JUSTICE GINSBURG joins, concurring in part and dissenting in part.

I agree that 18 U. S. C. § 3626(e)(2) (1994 ed., Supp. IV) is unambiguous and join Parts I and II of the majority opinion. I also agree that applying the automatic stay may raise the due process issue, of whether a plaintiff has a fair chance to preserve an existing judgment that was valid when entered. *Ante* this page. But I believe that applying the statute may

also raise a serious separation-of-powers issue if the time it allows turns out to be inadequate for a court to determine whether the new prerequisite to relief is satisfied in a particular case.[1]  I thus do not join Part III of the Court's opinion and on remand would require proceedings consistent with this one.   I respectfully dissent from the terms of the Court's disposition.

A prospective remedial order may rest on at least three different legal premises: the underlying right meant to be secured; the rules of procedure for obtaining relief, defining requisites of pleading, notice, and so on; and, in some cases, rules lying between the other two, such as those defining a required level of certainty before some remedy may be ordered, or the permissible scope of relief.   At issue here are rules of the last variety.[2]

Congress has the authority to change rules of this sort by imposing new conditions precedent for the continuing enforcement of existing, prospective remedial orders and requiring courts to apply the new rules to those orders. Cf. *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211, 232 (1995). If its legislation gives courts adequate time to determine the applicability of a new rule to an old order and to take the action necessary to apply it or to vacate the order, there seems little basis for claiming that Congress has crossed

---

[1] The Court forecloses the possibility of a separation-of-powers challenge based on insufficient time under the Prison Litigation Reform Act of 1995 (PLRA): "In this action, we have no occasion to decide whether there could be a time constraint on judicial action that was so severe that it implicated these structural separation of powers concerns.   The PLRA does not deprive courts of their adjudicatory role, but merely provides a new legal standard for relief and encourages courts to apply that standard promptly." *Ante*, at 350.

[2] Other provisions of the PLRA narrow the scope of the underlying entitlements that an order can protect, but some orders may have been issued to secure constitutional rights unaffected by the PLRA.   In any event, my concern here is solely with the PLRA's changes to the requisites for relief.

the constitutional line to interfere with the performance of any judicial function. But if determining whether a new rule applies requires time (say, for new factfinding) and if the statute provides insufficient time for a court to make that determination before the statute invalidates an extant remedial order, the application of the statute raises a serious question whether Congress has in practical terms assumed the judicial function. In such a case, the prospective order suddenly turns unenforceable not because a court has made a judgment to terminate it due to changed law or fact, but because no one can tell in the time allowed whether the new rule requires modification of the old order. One way to view this result is to see the Congress as mandating modification of an order that may turn out to be perfectly enforceable under the new rule, depending on judicial factfinding. If the facts are taken this way, the new statute might well be treated as usurping the judicial function of determining the applicability of a general rule in particular factual circumstances.[3] Cf. *United States* v. *Klein,* 13 Wall. 128, 146 (1872).

Whether this constitutional issue arises on the facts of this action, however, is something we cannot yet tell, for the

---

[3] The constitutional question inherent in these possible circumstances does not seem to be squarely addressed by any of our cases. Congress did not engage in discretionary review of a particular judicial judgment, cf. *Plaut* v. *Spendthrift Farm, Inc.,* 514 U. S. 211, 218, 226 (1995) (characterizing *Hayburn's Case,* 2 Dall. 409 (1792)), or try to modify a final, nonprospective judgment, cf. 514 U. S., at 218–219. Nor would a stay result from the judicial application of a change in the underlying law, cf. *Pennsylvania* v. *Wheeling & Belmont Bridge Co.,* 18 How. 421, 431 (1856); *Plaut, supra,* at 218 (characterizing *United States* v. *Klein,* 13 Wall. 128 (1872)). Instead, if the time is insufficient for a court to make a judicial determination about the applicability of the new rules, the stay would result from the inability of the Judicial Branch to exercise the judicial power of determining whether the new rules applied at all. Cf. *Marbury* v. *Madison,* 1 Cranch 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is").

District Court did not address the sufficiency of the time provided by the statute to make the findings required by § 3626(b)(3) in this particular action.[4] Absent that determination, I would not decide the separation-of-powers question, but simply remand for further proceedings. If the District Court determined both that it lacked adequate time to make the requisite findings in the period before the automatic stay would become effective, and that applying the stay would violate the separation of powers, the question would then be properly presented.

JUSTICE BREYER, with whom JUSTICE STEVENS joins, dissenting.

The Prison Litigation Reform Act of 1995 (PLRA) says that "any party or intervener" may move to terminate any "prospective relief" previously granted by the court, 18 U. S. C. § 3626(b)(1) (1994 ed., Supp. IV), and that the court shall terminate (or modify) that relief unless it is "necessary to correct a current and ongoing violation of [a] Federal right, extends no further than necessary to correct the violation . . . [and is] the least intrusive means" to do so. 18 U. S. C. § 3626(b)(3).

We here consider a related procedural provision of the PLRA. It says that "[a]ny motion to modify or terminate prospective relief . . . shall operate as a stay" of that prospective relief "during the period" beginning (no later than) the 90th day after the filing of the motion and ending when the motion is decided. § 3626(e)(2). This provision means

---

[4] Neither did the Court of Appeals. It merely speculated that "[i]t may be . . . that in some cases the courts will not be able to carry out their adjudicative function in a responsible way within the time limits imposed by (e)(2)," *French* v. *Duckworth*, 178 F. 3d 437, 447 (CA7 1999), without deciding whether this action presented such a situation. The court then concluded that "under *Klein* [the Congress] cannot take away the power of the court in a particular case to preserve the status quo while it ponders these weighty questions." *Ibid.*

approximately the following: Suppose that a district court, in 1980, had entered an injunction governing present and future prison conditions. Suppose further that in 1996 a party filed a motion under the PLRA asking the court to terminate (or to modify) the 1980 injunction. That district court would have no more than 90 days to decide whether to grant the motion. After those 90 days, the 1980 injunction would terminate automatically—regaining life only if, when, and to the extent that the judge eventually decided to deny the PLRA motion.

The majority interprets the words "shall operate as a stay" to mean, in terms of my example, that the 1980 injunction must become ineffective after the 90th day, *no matter what.* The Solicitor General, however, believes that the view adopted by the majority interpretation is too rigid and calls into doubt the constitutionality of the provision. He argues that the statute is silent as to whether the district court can modify or suspend the operation of the automatic stay. He would find in that silence sufficient authority for the court to create an exception to the 90-day time limit where circumstances make it necessary to do so. As so read, the statute would neither displace the courts' traditional equitable authority nor raise significant constitutional difficulties. See *Califano* v. *Yamasaki,* 442 U. S. 682, 705 (1979) (only "clearest" congressional "command" displaces courts' traditional equity powers); *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council,* 485 U. S. 568, 575 (1988) (the Court will construe a statute to avoid constitutional problems "unless such construction is plainly contrary to the intent of Congress").

I agree with the Solicitor General and believe we should adopt that " 'reasonable construction' " of the statute. *Ibid.* (quoting *Hooper* v. *California,* 155 U. S. 648, 657 (1895), stating " 'every reasonable construction must be resorted to, in order to save a statute from unconstitutionality' ").

## I

At the outset, one must understand why a more flexible interpretation of the statute might be needed. To do so, one must keep in mind the extreme circumstances that at least some prison litigation originally sought to correct, the complexity of the resulting judicial decrees, and the potential difficulties arising out of the subsequent need to review those decrees in order to make certain they follow Congress' PLRA directives. A hypothetical example based on actual circumstances may help.

In January 1979, a Federal District Court made 81 factual findings describing extremely poor—indeed "barbaric and shocking"—prison conditions in the Commonwealth of Puerto Rico. *Morales Feliciano* v. *Romero Barcelo*, 497 F. Supp. 14, 32 (PR 1979). These conditions included prisons typically operating with twice the number of prisoners they were designed to hold; inmates living in 16 square feet of space (*i. e.*, only 4 feet by 4 feet); inmates without medical care, without psychiatric care, without beds, without mattresses, without hot water, without soap or towels or toothbrushes or underwear; food prepared on a budget of $1.50 per day and "tons of food . . . destroyed because of . . . rats, vermin, worms, and spoilage"; "no working toilets or showers," "urinals [that] flush into the sinks," "plumbing systems . . . in a state of collapse," and a "stench" that was "omnipresent"; "exposed wiring . . . no fire extinguisher, . . . [and] poor ventilation"; "calabozos," or dungeons, "like cages with bars on the top" or with two slits in a steel door opening onto a central corridor, the floors of which were "covered with raw sewage" and which contained prisoners with severe mental illnesses, "caged like wild animals," sometimes for months; areas of a prison where mentally ill inmates were "kept in cells naked, without beds, without mattresses, without any private possessions, and most of them without toilets that work and without drinking water." *Id.,* at 20–23, 26–

27, 29, 32. These conditions had led to epidemics of communicable diseases, untreated mental illness, suicides, and murders. *Id.*, at 32.

The District Court held that these conditions amounted to constitutionally forbidden "cruel and unusual punishment." *Id.*, at 33–36. It entered 30 specific orders designed to produce constitutionally mandated improvement by requiring the prison system to, for example, screen food handlers for communicable diseases, close the "calabozos," move mentally ill patients to hospitals, fix broken plumbing, and provide at least 35 square feet (*i. e.*, 5 feet by 7 feet) of living space to each prisoner. *Id.*, at 39–41.

The very pervasiveness and seriousness of the conditions described in the court's opinion made those conditions difficult to cure quickly. Over the next decade, the District Court entered further orders embodied in 15 published opinions, affecting 21 prison institutions. These orders concerned, *inter alia,* overcrowding, security, disciplinary proceedings, prisoner classification, rehabilitation, parole, and drug addiction treatment. Not surprisingly, the related proceedings involved extensive evidence and argument consuming thousands of pages of transcript. See *Morales Feliciano* v. *Romero Barcelo,* 672 F. Supp. 591, 595 (PR 1986). Their implementation involved the services of two monitors, two assistants, and a Special Master. Along the way, the court documented a degree of "administrative chaos" in the prison system, *Morales Feliciano* v. *Hernandez Colon,* 697 F. Supp. 37, 44 (PR 1988), and entered findings of contempt of court against the Commonwealth, followed by the assessment and collection of more than $74 million in fines. See *Morales Feliciano* v. *Hernandez Colon,* 775 F. Supp. 487, 488, and n. 2 (PR 1991).

Prison conditions subsequently have improved in some respects. *Morales Feliciano* v. *Rossello Gonzalez,* 13 F. Supp. 2d 151, 179 (PR 1998). I express no opinion as to whether, or which of, the earlier orders are still needed. But my

brief summary of the litigation should illustrate the potential difficulties involved in making the determination of continuing necessity required by the PLRA. Where prison litigation is as complex as the litigation I have just described, it may prove difficult for a district court to reach a fair and accurate decision about which orders remain necessary, and are the "least intrusive means" available, to prevent or correct a continuing violation of federal law. The orders, which were needed to resolve serious constitutional problems and may still be needed where compliance has not yet been assured, are complex, interrelated, and applicable to many different institutions. Ninety days might not provide sufficient time to ascertain the views of several different parties, including monitors, to allow them to present evidence, and to permit each to respond to the arguments and evidence of the others.

It is at least possible, then, that the statute, as the majority reads it, would sometimes terminate a complex system of orders entered over a period of years by a court familiar with the local problem—perhaps only to reinstate those orders later, when the termination motion can be decided. Such an automatic termination could leave constitutionally prohibited conditions unremedied, at least temporarily. Alternatively, the threat of termination could lead a district court to abbreviate proceedings that fairness would otherwise demand. At a minimum, the mandatory automatic stay would provide a recipe for uncertainty, as complex judicial orders that have long governed the administration of particular prison systems suddenly turn off, then (perhaps selectively) back on. So read, the statute directly interferes with a court's exercise of its traditional equitable authority, rendering temporarily ineffective pre-existing remedies aimed at correcting past, and perhaps ongoing, violations of the Constitution. That interpretation, as the majority itself concedes, might give rise to serious constitutional problems. *Ante*, at 350.

## II

The Solicitor General's more flexible reading of the statute avoids all these problems. He notes that the relevant language says that the motion to modify or terminate prospective relief "shall operate as a stay" after a period of 30 days, extendable for "good cause" to 90 days. 18 U. S. C. § 3626(e)(2); see also Brief for United States 12. The language says nothing, however, about the district court's power to modify or suspend the operation of the "stay." In the Solicitor General's view, the "stay" would determine the legal status quo; but the district court would retain its traditional equitable power to change that status quo once the party seeking the modification or suspension of the operation of the stay demonstrates that the stay "would cause irreparable injury, that the termination motion is likely to be defeated, and that the merits of the motion cannot be resolved before the automatic stay takes effect." *Ibid.* Where this is shown, the "court has discretion to suspend the automatic stay and require prison officials to comply with outstanding court orders until the court resolves the termination motion on the merits," *id.*, at 12–13, subject to immediate appellate review, 18 U. S. C. § 3626(e)(4).

Is this interpretation a "reasonable construction" of the statute? *Edward J. DeBartolo Corp.*, 485 U. S., at 575. I note first that the statutory language is open to the Solicitor General's interpretation. A district court ordinarily can stay the operation of a judicial order (such as a stay or injunction), see *Scripps-Howard Radio, Inc.* v. *FCC*, 316 U. S. 4, 9–10, and n. 4 (1942), when a party demonstrates the need to do so in accordance with traditional equitable criteria (irreparable injury, likelihood of success on the merits, and a balancing of possible harms to the parties and the public, see *Doran* v. *Salem Inn, Inc.*, 422 U. S. 922, 931 (1975); *Yakus* v. *United States*, 321 U. S. 414, 440 (1944)). There is no logical inconsistency in saying both (1) a motion (to terminate) "shall operate as a stay," and (2) the court retains the power

to modify or delay the operation of the stay in appropriate circumstances. The statutory language says nothing about this last-mentioned power. It is *silent*. It does not direct the district court to leave the stay in place come what may.

Nor does this more flexible interpretation deprive the procedural provision of meaning. The filing of the motion to terminate prospective relief will still, after a certain period, operate as a stay without further action by the court. Thus, the motion automatically changes the status quo and imposes upon the party wishing to suspend the automatic stay the burden of demonstrating strong, special reasons for doing so. The word "automatic" in the various subsection titles does not prove the contrary, for that word often means self-starting, not unstoppable. See Websters Third New International Dictionary 148 (1993). Indeed, the Bankruptcy Act uses the words "automatic stay" to describe a provision stating that "a petition filed . . . operates as a stay" of certain other judicial proceedings—despite the fact that a later portion of that same provision makes clear that under certain circumstances the bankruptcy court may terminate, annul, or modify the stay. 11 U. S. C. § 362(d); see also 143 Cong. Rec. S12269 (Nov. 9, 1997) (statement of Sen. Abraham) (explaining that § 3626(e)(2) was modeled after the Bankruptcy Act provision). And the Poultry Producers Financial Protection Act of 1987 specifies that a court of appeals decree affirming an order of the Secretary of Agriculture "shall operate as an injunction" restraining the "live poultry dealer" from violating that order, 7 U. S. C. § 228b–3(g); yet it appears that no one has ever suggested that a court of appeals lacks the power to modify that "injunction" where appropriate. Moreover, the change in the legal status quo that the automatic stay would bring about, and the need to demonstrate a special need to lift the stay (according to traditional equitable criteria), mean that the stay would remain in effect in all but highly unusual cases.

In addition, the surrounding procedural provisions are most naturally read as favoring the flexible interpretation. The immediately preceding provision requires the court to rule "promptly" upon the motion to terminate and says that "[m]andamus shall lie to remedy any failure to issue a prompt ruling." 18 U. S. C. § 3626(e)(1). If a motion to terminate takes effect automatically through the "stay" after 30 or 90 days, it is difficult to understand what purpose would be served by providing for mandamus—a procedure that itself (in so complicated a matter) could take several weeks. But if the automatic stay might be modified or lifted in an unusual case, providing for mandamus makes considerable sense. It guarantees that an appellate court will make certain that unusual circumstances do in fact justify any such modification or lifting of the stay. A later provision that provides for immediate appeal of any order "staying, suspending, delaying, or barring the operation of the automatic stay" can be read as providing for similar appellate review for similar reasons. § 3626(e)(4).

Further, the legislative history is neutral, for it is silent on this issue. Yet there is relevant judicial precedent. That precedent does not read statutory silence as denying judges authority to exercise their traditional equitable powers. Rather, it reads statutory silence as authorizing the exercise of those powers. This Court has said, for example, that "[o]ne thing is clear. Where Congress wished to deprive the courts of this historic power, it knew how to use apt words— only once has it done so and in a statute born of the exigencies of war." *Scripps-Howard, supra,* at 17. Compare *Lockerty* v. *Phillips,* 319 U. S. 182, 186–187 (1943) (finding that courts were deprived of equity powers where the statute explicitly removed jurisdiction), with *Scripps-Howard, supra,* at 8–10 (refusing to read silence as depriving courts of their historic equity power), and *Califano,* 442 U. S., at 705–706 (same). These cases recognize the importance of permitting courts in equity cases to tailor relief, and related

relief procedure, to the exigencies of particular cases and individual circumstances. In doing so, they recognize the fact that in certain circumstances justice requires the flexibility necessary to treat different cases differently—the rationale that underlies equity itself. Cf. *Hecht Co.* v. *Bowles,* 321 U. S. 321, 329 (1944) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case").

Finally, the more flexible interpretation is consistent with Congress' purposes as revealed in the statute. Those purposes include the avoidance of new judicial relief that is overly broad or no longer necessary and the reassessment of pre-existing relief to bring it into conformity with these standards. But Congress has simultaneously expressed its intent to maintain relief that is narrowly drawn and necessary to end unconstitutional practices. See 18 U. S. C. §§ 3626(a)(1), (a)(2), (b)(3). The statute, as flexibly interpreted, risks interfering with the first set of objectives only to the extent that the speedy appellate review provided in the statute fails to control district court error. The same interpretation avoids the improper provisional termination of relief that is constitutionally necessary. The risk of an occasional small additional delay seems a comparatively small price to pay (in terms of the statute's entire set of purposes) to avoid the serious constitutional problems that accompany the majority's more rigid interpretation.

The upshot is a statute that, when read in light of its language, structure, purpose, and history, is open to an interpretation that would allow a court to modify or suspend the automatic stay when a party, in accordance with traditional equitable criteria, has demonstrated a need for such an exception. That interpretation reflects this Court's historic reluctance to read a statute as depriving courts of their traditional equitable powers. It also avoids constitutional difficulties that might arise in unusual cases.

I do not argue that this interpretation reflects the most natural reading of the statute's language. Nor do I assert that each individual legislator would have endorsed that reading at the time. But such an interpretation is a reasonable construction of the statute. That reading harmonizes the statute's language with other basic legal principles, including constitutional principles. And, in doing so, it better fits the full set of legislative objectives embodied in the statute than does the more rigid reading that the majority adopts.

For these reasons, I believe that the Solicitor General's more flexible reading is the proper reading of the statute before us. I would consequently vacate the decision of the Court of Appeals and remand this action for further proceedings.