**David RUIZ, et al., Plaintiffs,**

**United States of America, Plaintiff–Intervenor;**

v.

**Gary JOHNSON, et al., Defendants,**

**Honorable John Culberson and Honorable J.E. "Buster" Brown, Defendant–Intervenors.**

**No. CIV. A. H–78–987.**

United States District Court, S.D. Texas, Houston Division.

June 18, 2001.

Donna Brorby, San Francisco, CA, William Bennett Turner, San Francisco, CA, Gail J. Saliterman, San Francisco, CA, for plaintiffs.

John Cornyn, Atty. Gen. of Texas, Andy Taylor, First Atty. Gen., Michael T. McCaul, Deputy Atty. Gen. for Criminal Justice, Austin, TX, Gregory Coleman, Solicitor Gen., Austin, TX, Philip E. Marrus, Austin, TX, Sharon Felfe, Austin, TX, Karen Ray, Austin, TX, Charles Eldred, Austin, TX, Robert B. Maddox, Austin, TX, for defendants.

## MEMORANDUM OPINION

Justice, Senior District Judge.

### TABLE OF CONTENTS

I. Introduction ........................................................980

II. Background ..........................................................980
  A. Development of the Case ..........................................980
  B. The Fact–Finding Hearing, 1999 Memorandum Opinion and Order, and
     the Fifth Circuit's Remand Order ...................................982

III. Current and Ongoing Constitutional Violations ........................983
  A. Administrative Segregation ........................................984
  B. Inmate Safety ....................................................986
  C. Use of Force .....................................................986
  D. Medical and Psychiatric Services ...................................987

IV. Existing Prospective Relief: The 1992 Final Judgment ...................988
  A. Staffing .........................................................988
  B. Support Services .................................................989
  C. Discipline .......................................................990
  D. Administrative Segregation ........................................991
  E. Use of Force .....................................................991
  F. Access to Courts .................................................994

G. Visits .................................................................. 995
H. Crowding .............................................................. 995
I. Reporting; Monitoring by Plaintiffs' Counsel ........................... 996
J. Defendants' Internal Monitoring ....................................... 997
K. Health Services ....................................................... 997
L. Death Row ............................................................. 999

V. Proposed Modifications and New Prospective Relief ...................... 999

VI. Conclusion ............................................................ 1000

## I. INTRODUCTION

This civil action, now almost thirty years in existence, concerns the constitutionality of the practices and conditions of the Texas Department of Criminal Justice–Institutional Division's (TDCJ–ID) prisons. After a lengthy trial, it was held that these practices and conditions violated the Eighth and Fourteenth Amendments to the U.S. Constitution in numerous respects, and relief was granted to the plaintiff class ·of inmates. In 1992, a consent decree, which contained permanent injunctive relief in certain areas and terminated relief and the court's jurisdiction in others, was adopted and issued as a final judgment. Since 1996, the defendants have sought to terminate this Final Judgment and the court's remaining oversight of the Texas prison system.

Two years ago, an evidentiary hearing was had on the defendants' motions to terminate the final judgment under the Prison Litigation Reform Act (PLRA).[1] At that time, the court held that the termination provisions were unconstitutional as violating the separation of powers doctrine and the prisoners' due process rights. *See Ruiz v. Johnson*, 37 F.Supp.2d 855 (S.D.Tex.1999). In the alternative, the defendants' motions were denied based on the current and ongoing constitutional violations in the TDCJ–ID's facilities that were shown to exist in three major areas. *Id.* On appeal, the Fifth Circuit upheld the PLRA's termination provisions and remanded for additional findings regarding the continuing vitality of the 1992 Final Judgment. The court now reconsiders the defendants' motions to terminate all prospective relief to the plaintiff class.

## II. BACKGROUND

### A. Development of the Case

David Ruiz and other named state inmate plaintiffs initiated this civil action in 1972 alleging unconstitutional practices and conditions in the Texas Department of Corrections' (TDC) prisons.[2] Ruiz's suit was consolidated with a number of others,

---

1. The PLRA "establishes standards for the entry and termination of prospective relief in civil actions challenging prison conditions." *Miller v. French*, 530 U.S. 327, 331, 120 S.Ct. 2246, 2250, 147 L.Ed.2d 326 (2000); *see* Pub.L. No. 104–134, 110 Stat. 1321–66 (1996). In essence, the law aimed to limit federal court intervention in the operation of correctional facilities and to curb frivolous inmate litigation. *See Inmates of Suffolk County Jail v. Rouse*, 129 F.3d 649, 655 (1st Cir.1997) (commenting further that PLRA intended to serve as "last rite" for many consent decrees). The PLRA entitles parties to the termination of existing prospective relief relating to prison conditions, unless the court makes written findings that such relief "remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." 18 U.S.C. § 3626(b)(1)(3).

2. The TDC was succeeded by Texas Department of Criminal Justice (TDCJ) and the TDCJ–ID.

and class action status was granted to the plaintiffs, who represented all past, present, and future inmates in the TDC. The inmate plaintiffs, joined by plaintiff-intervenor the United States, alleged that the TDC's conditions and practices violated the Eighth and Fourteenth Amendments to the U.S. Constitution. The 159-day trial in 1978 and 1979 exposed the truly horrendous living conditions of inmates inside the Texas prisons. *See generally Ruiz v. Estelle*, 503 F.Supp. 1265 (S.D.Tex. 1980). Based on extensive and detailed findings of fact, it was held that the prisons were grossly overcrowded; that sanitation and recreational facilities were wholly inadequate; that health care was inadequate; that hearing procedures for discipline were inadequate; that access to courts was inadequate; and that fire safety and sanitation standards were in violation of state law and the Constitution. *Id.*

On April 20, 1981, the court issued a consent decree which granted comprehensive injunctive relief in areas such as inmate population/crowding, staffing, medical and psychological care, and health and safety.[3] *See Ruiz v. Estelle*, 679 F.2d 1115, 1165 (5th Cir.1982); Appendix A. A special master was appointed to supervise and monitor the effectuation of court orders and the provisions of the consent decree. *See Ruiz*, 503 F.Supp. at 1389–90. The parties spent the remainder of the 1980's negotiating various remedial measures and returning to the court with stipulations and motions for certain relief. *See Ruiz v. Lynaugh*, 811 F.2d 856, 857

(5th Cir.1987). In March 1990, the parties were ordered to negotiate a comprehensive settlement of all remedial issues, which was submitted to the court two years later.

After an evidentiary hearing, the court approved the settlement in an order issued December 11, 1992. This Final Judgment vacated and replaced numerous detailed orders and compliance plans. It terminated the court's jurisdiction in nine substantive areas and continued permanent injunctive orders on eight substantive issues—staffing, discipline, administrative segregation, use of force, access to courts, crowding, health services, and death row. In March 1996, the defendants moved to vacate the Final Judgment under Rule 60(b)(5) of the Federal Rules of Civil Procedure. They argued that their "compliance with the Final Judgment, the public's interest, and the State of Texas' desire to exercise autonomy over its institutions, mandate that any remaining vestiges of court involvement-however passive-with the prison system, now be vacated."[4] (Defs. Mot. to Vacate Final J., Mar. 25, 1996.)

The passage of the PLRA one month later made it possible for the defendants to file supplemental motions to terminate prospective relief: first, under the PLRA's immediate termination provision, 18 U.S.C. § 3626(b)(2)[5] (Defs.Mot., Sept. 5, 1996); and second, upon the expiration of the two-year period after the date of the PLRA's enactment under 18 U.S.C. § 3626(b)(1)(A)(iii).[6] (Defs.Mot., May 5,

---

3. Amended May 1, 1981.

4. Defendants withdrew their Rule 60(b)(5) motion to vacate in July, 1997.

5. Section 3626(b)(2) provides that "in any civil action with respect to prison conditions, a defendant or intervener shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in

the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of a Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."

6. Section 3626(b)(1)(A)(iii) provides that "in any civil action with respect to prison conditions in which prospective relief is ordered,

1998.) Plaintiffs opposed these motions on several grounds. They argued, *inter alia,* that the PLRA's termination provisions violated the separation of powers doctrine; that the act violated the plaintiffs' due process and equal protection rights; and, alternatively, that the Texas state prison system still suffered from constitutional infirmities. *See Ruiz,* 37 F.Supp.2d at 870.

## B. The Fact–Finding Hearing, 1999 Memorandum Opinion and Order, and the Fifth Circuit's Remand Order

The court conducted an evidentiary hearing on the defendants' motions from January 21 to February 12, 1999. The primary purpose of the hearing was to receive evidence on whether any current and ongoing constitutional violations existed that would require the continuation of the 1992 Final Judgment. *See* 18 U.S.C. § 3626(b)(3) (limitation of termination).[7] In the court's view, such a hearing was absolutely necessary prior to a ruling on termination.[8] It would afford the parties an opportunity to submit evidence on the remaining substantive areas of court supervision, those being: staffing, access to courts, health services, support services to inmates, contact visitation, discipline, crowding, death row, administrative segre-

gation, internal monitoring and enforcement, and the use of force.

In a Memorandum Opinion issued March 1, 1999 ("1999 Memorandum Opinion") and accompanying Order, the defendants' two motions to terminate the 1992 Final Judgment under the PLRA were denied. Specifically, it was found that the termination provisions of the PLRA violated the separation of powers doctrine and the due process clause of the U.S. Constitution. *Ruiz,* 37 F.Supp.2d at 882. The opinion also included detailed findings of fact concerning current prison conditions based on the parties' evidence, and it identified extant constitutional violations in the areas of administrative segregation, inmate safety and the use of force. *Id.* at 885–940.

The accompanying order provided that if the PLRA was held to be constitutional on appeal, an alternative order would be entered. Based on the specific findings contained in the Memorandum Opinion, this Alternative Order identified systemic constitutional violations in the conditions of confinement in administrative segregation, in the failure to provide reasonable safety to inmates against assault and abuse, and in the excessive use of force by correctional officers in Texas prisons. It rendered inoperative certain sections of the 1992 Final Judgment concerning access to

---

such relief shall be terminable upon the motion of any party or intervener, in the case of an order issued on or before the date of enactment of the Prison Litigation Reform Act, two years after such date of enactment." The relief ordered in the 1992 Final Judgment thus became eligible for termination on April 26, 1998.

7. The PLRA includes the following proviso: Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the viola-

tion of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.
18 U.S.C. § 3626(b)(3).

8. This position was later embraced by the Fifth Circuit in a separate action. *See Castillo v. Cameron County, Texas,* 238 F.3d 339, 355 (5th Cir.2001) (holding that district court should afford parties opportunity to present evidence regarding unconstitutional prison conditions subject to consent decree); *see also Cason v. Seckinger,* 231 F.3d 777, 781–83 (11th Cir.2000).

courts, health services, and death row. Finally, it ordered the parties to attempt to construct a remedial plan that would address the existing constitutional violations and that would meet the rigors of the PLRA.

The defendants promptly appealed the court's decision to the United States Court of Appeals for the Fifth Circuit. On March 20, 2001, the Fifth Circuit announced its ruling. *See Ruiz v. Johnson*, 243 F.3d 941 (5th Cir.2001). Disagreeing with this court's legal conclusions, the Fifth Circuit found the PLRA to comport with the separation of powers doctrine and due process, thus validating the termination provisions contained in 18 U.S.C. § 3626(b).[9] *Id.*

On the issue of the applicability of the § 3626(b)(3) limits on termination and the nature of the Alternative Order, the Fifth Circuit found that the district court had not made the required findings to sustain the prospective relief contained in the 1992 Final Judgment. To that end, the court remanded with the following instructions:

> The [district] court should ... consider each provision of the consent decree in light of the current and ongoing constitutional violations, if there are any, and determine which aspects of the decree remain necessary to correct those violations....
>
> ...[I]f there are remaining aspects of the decree which are still necessary, the court should determine whether those parts of the decree are narrowly drawn and the least intrusive means to correct the applicable violation....

The procedure outlined above is mandated by § 3626(b)(3) and cannot be circumvented by a mere recitation of the key statutory language. Instead, the requisite findings must be evinced in writing with respect to each remaining aspect of prospective relief. Otherwise, the district court should terminate the unnecessary relief, assuming that the other requirements for termination under § 3626 are met.

> .    .    .    .    .

> ...[O]n remand, the court should make an assessment, in the manner described above, as to each provision of the 1992 judgment, in light of its findings of the unconstitutionality of various conditions in TDCJ–ID.

*Id.* at 950–52 (citations omitted). Mindful of the Fifth Circuit's guidance, the court now proceeds to outline its findings.

## III. CURRENT AND ONGOING CONSTITUTIONAL VIOLATIONS

██ Since the court's most recent findings on prison conditions were announced, the Fifth Circuit has clarified some significant principles governing the § 3626(b)(3) analysis. Concerning the existence of current and ongoing violations of a federal right, the Fifth Circuit held that "a court must look at the conditions in the jail at the time termination is sought, not at conditions that existed in the past or at conditions that may possibly occur in the future." *Castillo v. Cameron County, Texas*, 238 F.3d 339, 354 (5th Cir.2001). Importantly, the findings made by this court two years ago fully comply with this instruction. The determinations of cur-

---

9.  In an unrelated action, the U.S. Supreme Court upheld the automatic stay provision of the PLRA, which imposes a stay on any prospective relief thirty days after a motion for termination is filed under § 3626(b)(1) or (2). *Miller v. French*, 530 U.S. 327, 120 S.Ct.

2246, 147 L.Ed.2d 326 (2000). It assumed, without deciding, that the standards for termination of relief set forth in § 3626(b) were constitutionally sound. *Id.* at 347, 120 S.Ct. 2246.

rent and ongoing constitutional violations outlined in the 1999 Memorandum Opinion rest solely upon the evidence presented at the hearing held that same year, which consisted of the most recent data available on the conditions of the Texas prisons relevant to this civil action. Accordingly, all findings of fact and conclusions of law set forth in the Memorandum Opinion regarding the current and ongoing violations of the plaintiffs' constitutional rights are hereby adopted and incorporated. All credibility determinations and rulings on evidentiary objections previously made by the court in the termination proceedings, as outlined in the 1999 Memorandum Opinion, are similarly adopted and incorporated.

The parties have urged the court to reconsider the findings made in its Memorandum Opinion. (Defs.' and Def.-Intervenors' Post–Remand Mem.; Plfs.' Reply to Defs.' Post–Remand Mem.) It is determined that such an exercise is unnecessary. The Fifth Circuit's remand order explicitly states that the evidentiary record need not be re-opened.[10] Further, upon full consideration of the parties' briefs, the court is not persuaded that it erred in

either its factual or legal findings set forth in the 1999 Memorandum Opinion.[11]

For purposes of completeness, the court's 1999 findings are briefly summarized below. All affirmative findings of fact were based on credible evidence. Where constitutional violations were identified, they were so proved by the plaintiffs by a preponderance of the evidence.[12]

## A. Administrative Segregation

■ Two years ago, it was held that the extreme deprivations and repressive conditions of confinement in The TDCJ–ID's administrative segregation units violated the prohibition against cruel and unusual punishment contained in the Eighth Amendment to the U.S. Constitution, as to the plaintiff class generally and to the subclass of mentally ill inmates housed in such confinement. *Ruiz*, 37 F.Supp.2d at 861. The court found that "Texas's administrative segregation units are virtual incubators of psychoses—seeding illness in otherwise healthy inmates and exacerbating illness in those already suffering from mental infirmities." *Id.* at 907. According to TDCJ–ID policy, administrative segregation involves "separation of an offender from the general population for the pur-

10. The panel expressed that "[t]he constitutional findings made by the district court were based on the evidence in the record concerning the current state of TDCJ–ID and are sufficient to permit the court to analyze the continued necessity of each provision of the 1992 judgment." *Ruiz*, 243 F.3d at 952.

11. As part of these proceedings on remand, the parties were requested to file a proposed form of final judgment and briefs. (Order [Document No. 8952], Ap. 4, 2001.) Each side was permitted to respond to the other side's submission. Defendants have moved to strike certain portions of the Plaintiffs' Reply and Amended Proposed Order, arguing that the plaintiffs failed to limit their reply to the subject matter contained in the defendants' initial filing. The defendants are primarily

concerned with their lack of opportunity to respond to plaintiffs' assertions regarding inmate health care. Since the court has declined to make new findings, defendants' motion shall be denied. In addition, it is noted that the defendants could have moved under Local Rule 7 for leave to submit additional briefs, which they did not do.

12. Prior to the 1999 evidentiary hearing, it was determined that the burden of showing extant constitutional violations would fall on the plaintiffs. This position has since been adopted by the First Circuit. *See Laaman v. Warden, New Hampshire State Prison*, 238 F.3d 14, 20 (1st Cir.2001); *but see Gilmore v. People of the State of California*, 220 F.3d 987, 1008 (9th Cir.2000) (placing burden on state defendants).

pose of maintaining safety, security and order among general population offenders and correctional personnel and within the prison institution." *Id.* at 908. Evidence presented by the plaintiffs revealed that inmates in administrative segregation are completely deprived of property,[13] personal contact, and mental stimulus. *Id.* at 908. Experts reported that incidents of self-mutilation and incessant babbling and shrieking were almost daily events. *Id.* at 908. In three units, plaintiff's expert witness Craig Haney, Ph.D., J.D., found that "high numbers of prisoners were living in psychological distress and pain." *Id.* at 909. The picture he painted of some inmates' behavior in administrative segregation was harrowing:

I'm talking about forms of behavior that are easily recognizable and that are stark in nature when you see them, when you look at them, when you're exposed to them. In a number of instances, there were people who had smeared themselves with feces. In other instances, there were people who had urinated in their cells, and the urination was on the floor....There were many people who were incoherent when I attempted to talk to them, babbling, sometimes shrieking, other people who appeared to be full of fury and anger and rage and were, in some instances, banging their hands on the side of the wall and yelling and screaming, other people who appeared to be simply disheveled, withdrawn and out of contact with the circumstances or surroundings. Some of them would be huddled in the back corner of the cell and appeared incommunicative when I attempted to speak with them. Again, these were not subtle diagnostic issues. These were people

who appeared to be in profound states of distress and pain.

.    .    .    .    .

The bedlam which ensued each time I walked out into one of those units, the number of people who were screaming, who were begging for help, for attention, the number of people who appeared to be disturbed, the existence, again, of people who were smeared with feces, the intensity of the noise as people began to shout and ask, Please come over here. Please talk to me. Please help me. It was shattering. And as I discussed this atmosphere with the people who worked here, I was told that this was an everyday occurrence, that there was nothing at all unusual about what I was seeing.

*Id.* at 909–10.

In addition, it was found that a large majority of inmates being moved into the administrative segregation system are immediately placed in the most severe level of restriction (Level III), rather than beginning at a lower level and being moved up through the graduated system, if necessary. *Ruiz,* 37 F.Supp.2d at 911. Finally, plaintiffs provided evidence, through the testimony of Dennis Michael Jurczak, M.D., that administrative segregation is being used to warehouse mentally ill inmates in need of medical attention, and that the repressive conditions of administrative segregation actually harm such inmates. *Id.* at 911–12.

Based on all the evidence, it was found that current and ongoing Eighth Amendment violations had been established as to the conditions of confinement in administrative segregation, particularly in Levels II and III, and regarding the practice of using administrative segregation to house

---

**13.** Expert witness Chase Riveland could not identify any correctional purpose in denying inmates personal property items such as books, soap, and deodorant. *Ruiz,* 37 F.Supp.2d at 911.

mentally ill prisoners. *Id.* at 915. The level of deprivation of basic mental health needs marked by extreme social isolation and reduced environmental stimulation were determined to violate the "evolving standards of decency that mark progress of a maturing society." *Id.* at 914–15, *quoting Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Similarly, the defendants' deliberate indifference to the risks posed by subjecting mentally ill inmates to extended periods of confinement in administrative segregation was held to be constitutionally infirm. *Id.* at 915.

**B. Inmate Safety**

■ In its 1999 Memorandum Opinion, this court identified a current and ongoing constitutional violation in the failure of prison officials to ensure that inmates are not subjected to any punishment beyond that which is necessary for the orderly control of the prison. *Ruiz,* 37 F.Supp.2d at 915. It was found that members of the plaintiff class remain in conditions allowing a substantial risk of physical and sexual abuse from other inmates. *Id.* at 861. This state of affairs was determined to be the result not of a lack of sound policy, but rather The TDCJ–ID's failure to effectively implement such policy. *Id.* at 928.

Witnesses testified to the commonplace one-on-one and group-on-one inmate fights [14] as well as sexual assaults.[15] *Id.* at 917–19. Safekeeping and protective custody were recognized as defective: inmates seeking refuge from harm or threat of harm often had to subject themselves to punishment and disciplinary measures by corrections officers in order to avoid harm from other inmates, since relief could not be obtained through the grievance system. *Id.* at 922–23. Inmate testimony established that prison officials are aware of the violence between and among the inmates, but that protection could not be obtained absent evidence of injury. *Id.* at 925–26.

The court concluded with the following findings:

> The plaintiffs have shown by a preponderance of the evidence both the objective and subjective elements of an Eighth Amendment claim for failure to reasonably protect them from harm.... [T]he combination of inmates who are routinely subjected to violence, -extortion, and rape; of officers who are aware of inmate-on-inmate victimization but fail to respond to the victims; of high barriers preventing inmates from seeking safekeeping or protective custody; and of a system that fails accurately to report, among other data, instances of requests for safekeeping and sexual assaults; and, as well, the obviousness of the risk to prison officials, when taken together, have the mutually enforcing effect of rendering prison conditions cruel and unusual by denying inmates safety from their fellow inmates.

*Id.* at 928–29.

**C. Use of Force**

■ In 1999, the court was reacquainted with "the culture of sadistic and malicious violence that continues to pervade the Texas prison system [and] violate[s] contemporary standards of decency." *Id.* at 929. As with conditions of inmate safety, the abuse of use of force has resulted not from

---

**14.** Data showed 10.5 inmate-on-inmate assaults per 1,000 inmates for the year 1998. *Id.* at 916.

**15.** Exact figures on the number of inmate sexual assaults differ among sources. In 1998, the number of reported assaults ranged from 81 to 107. *Id.*

deficient policies,[16] but from the seeming inability of correctional officers to "keep their hands off prisoners." *Id.* at 932.

Plaintiffs' experts testified to the institution's reliance on "force or threat of force for the control of people." *Id.* at 933. They cited examples of force being used simply to punish or hurt inmates, and frequent pushing, shoving, and other unnecessary physical contact. *Id.* at 932–33. Plaintiffs' expert Allen Breed, who had monitored the use of force in several other states, found Texas to be worse, in quantity and degree, than any other system he had seen. *Id.* at 933. Evidence demonstrated that inmates are being hit while in restraints;[17] that they are being struck by officers with their fists[18]—a practice deemed inappropriate by defendants' expert Gary DeLand; and that they suffer other injuries from officer actions. *Id.* at 933–34. Monitoring, supervision, grievance, and investigations processes were found to be inadequate to curb the excessive use of force. *Id.* at 936–39. The court determined that in numerous examples brought before it, no justification for use of force by TDCJ–ID officers existed, or the force used was disproportionate to the circumstances. The prevalence of excessive use of force was held to be cruel and unusual punishment. *Id.* at 939.

### D. Medical and Psychiatric Services

■ As explained during the 1999 hearing, two of the State of Texas's premier medical teaching institutions, the University of Texas Medical Branch at Galveston (UTMB) and Texas Tech University Health Sciences Center, currently provide treatment to inmates in state correctional facilities. *Id.* at 892. Nevertheless, a number of systemic deficiencies has limited availability of sufficient medical treatment for inmates across the state. *Id.* The court heard witness accounts of grossly inadequate medical and psychiatric treatment. Plaintiffs' expert witnesses' health care audits also revealed a health care system that stops short of providing adequate medical care to inmates. *Id.*

Specifically, the experts commented on the system's dependence on non-physicians to make medical decisions, often beyond their expertise, and the low rate of physician review of those decisions;[19] the inadequate evaluation and referral system which is often marked by unacceptable delays in treatment; a failure to follow-up with at-risk patients; general staff indifference to complaints; poor treatment of diabetes including the failure to perform basic preventive tests against common complications; inadequate access to medication and the lack of communication between treating hospitals and unit medical care facilities; incidents of medically-based work restrictions being ignored by correctional officers; and the general failure to self-monitor the quality of treatment being administered.[20] *Id.* at 897–

---

16. In fact, one of plaintiffs' expert witnesses found TDCJ–ID policies and procedures governing use of force concerns to be generally acceptable. *Id.* at 919.

17. Twenty-seven of eighty-two major use of force reports contained in Defs. Ex. 221 recorded force against restrained inmates, with thirteen of those inmates being "slammed" or taken to the ground. *Id.* at 933.

18. For September 1998 at the Connolly unit, fourteen of the thirty-six use of force reports noted inmate injury and five inmates had been struck by an officer with a fist. *Id.* at 934.

19. In Texas, the rate of physician review is 10%, as compared to 100% in New Mexico. *Ruiz,* 37 F.Supp.2d at 897.

20. The TDCJ–ID has no formal tracking and reporting system to monitor and evaluate its health care. *Id.* at 901.

901. With respect to psychiatric services, plaintiffs' experts again highlighted several deficiencies, including "not recognizing or minimizing symptoms indicative of major mental illnesses;" failing to recognize psychiatric needs; and a practice of unnecessarily changing diagnoses. *Id.* at 903–04.

The evidence presented, however, was insufficient to show that the defendants were deliberately indifferent to the prisoners' physical and mental health needs, as required to prove a violation of the Eighth Amendment.[21] *Id.* at 906. While the court remains deeply disturbed by the current sub-par level of medical treatment being provided by The TDCJ–ID to its inmates, a system-wide deliberate indifference to health needs has not been shown to exist.

## IV. EXISTING PROSPECTIVE RELIEF: THE 1992 FINAL JUDGMENT

Defendants have moved for termination of the prospective relief granted in the 1992 Final Judgment under two provisions of the PLRA: 18 U.S.C. § 3626(b)(1)(A)(iii), mandating termination two years after the date of PLRA's enactment; and 18 U.S.C. § 3626(b)(2), mandating immediate termination. Pursuant to Section 3626(b)(3), such relief shall not terminate where "prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the viola-

tion of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." Having concluded that current and ongoing constitutional violations exist—detailed in the 1999 Memorandum Opinion and summarized above—the court must now undertake to review the terms of the 1992 Final Judgment in light of those violations and the standards set forth by the PLRA. This exercise entails a three-pronged evaluation of each provision of the 1992 Final Judgment. Specifically, it must be determined whether the relief granted in each section: (1) remains necessary to correct a current and ongoing violation of plaintiffs' rights; (2) extends no further than necessary to correct the identified violation; and (3) is narrowly drawn and is the least intrusive means to correct the identified violation. Any provision that cannot satisfy any one of these requirements must be terminated.

### A. Staffing

■ Section II[22] of the Final Judgment states in relevant part:

> Defendants shall employ sufficient trained security and non-security staff to provide for and maintain the security, control, custody and supervision of prisoners, taking account of the security and custody levels for the prisoner population and the design of defendants' facilities.

**21.** "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). It is an extremely high standard. *See, e.g., Stewart v. Murphy,* 174 F.3d 530 (5th Cir.1999) (finding no Eighth Amendment violation where prison physician failed to follow non-prison surgeon's advice to transfer inmate to another facility for physical therapy for his decubitus ulcers (bedsores),

even though decubitus ulcers ultimately caused inmate's death).

**22.** Section I of the Final Judgment lays out the purpose and scope of the order. It does not impose any independent obligations on the TDCJ–ID and does not contain any prospective relief. Thus, it is not subject to termination and is not before the court for review.

There is no evidence in the record to demonstrate that Section II of the Final Judgment (1) "remains necessary to correct a current and ongoing violation of the Federal right," (2) "extends no further than necessary to correct the violation of the Federal right," and (3) "is narrowly drawn and the least intrusive means to correct the violation." Section II should, therefore, be terminated.

Plaintiffs have argued that the violations identified in the area of inmate protection require the continuation of the Section II staffing provision.[23] The court's 1999 findings that relate directly to inmate protection issues largely involve the defendants' failure to respond adequately to inmates' protection needs, including their requests for protection. As articulated in their closing arguments during the 1999 evidentiary hearing, the plaintiffs charge that understaffing is a contributing factor of the failure to provide adequate safety to inmates. A finding on the link between staffing and prisoner safety was not made in the court's 1999 Memorandum Opinion, and upon careful review of the record, the court cannot now discern evidence to support such a finding by a preponderance of the evidence.[24]

More specifically, the plaintiffs have argued that the inmate protection problems existing in today's state prisons have been caused, in part, by the loss of two to three hundred classification case managers in 1995. *Ruiz*, 37 F.Supp.2d at 871. While found to be "plausible" and "a rational explanation" that the loss of the classification case manger positions could be responsible for inmate-on-inmate assaults, the "causal connection in this matter has not been proved by preponderance of the evidence." *Id.* at 925. Upon such record, it is not possible to find necessary continued relief regarding staffing.

Because there is no evidence to link the number of security and non-security staff to the constitutional violations identified by the court, the staffing provision fails the first prong of § 3626(b)(3). Section II, Staffing, does not meet the need-narrowness-intrusiveness requirements of the PLRA and, thus, should be terminated.

## B. Support Services

■ Section III of the Final Judgment concerns the proper role of support services inmates and enjoins the Institutional Division as follows:

No prisoner shall be permitted to exercise authority over another prisoner, to supervise another prisoner, to convey orders or instructions from TDCJ–ID employees to another prisoner, to discipline another prisoner, to count or assist in counting other prisoners, to obtain sensitive information about other prisoners absent a state or federal court order or, except as required or permitted by the nature of the prisoner's classification status or non-support service job or program assignment, to have special privileges such as special or extra clothing, food, property, cell assignments or recreation. The purpose of the restriction on sensitive information is to prevent a prisoner from gaining power or an ad-

---

23. Actually, the plaintiffs have prosed a modified provision which would obligate the defendants to "employ sufficient trained staff to comply with this Order." (Plfs. Prop. Order upon Remand from Ct. of Appeals, ¶ 3.)

24. In fact, one of plaintiffs' expert witnesses, Allen Breed, testified that he was unable to give an assessment of the sufficiency of staffing levels. (Tr. at 1139 ("I cannot answer whether there are sufficient officers."); *see also* Test. Chase Riveland, Tr. at 854 ("I actually made no judgment on staff in terms of custody staff.... I did not see [staff ratios] as an issue related to the final order.").)

vantage over another prisoner as a result of obtaining information about the other prisoner. "Sensitive information" is defined in Section I.G of the Stipulated Modification of Sections II.A and II.D of Amended Decree, but this definition may be modified by the Board of Criminal Justice as appropriate and consistent with the purpose of this paragraph III.[25]

There is no evidence in the record to demonstrate that Section III of the Final Judgment (1) "remains necessary to correct a current and ongoing violation of the Federal right," (2) "extends no further than necessary to correct the violation of the Federal right," and (3) "is narrowly drawn and the least intrusive means to correct the violation." Based on the evidence adduced at the 1999 hearing, no findings were made with regard to support services inmates, and Section III's requirements for support services inmates relate in no way to the three ongoing constitutional violations identified by the court.

Considering Section III in light of the court's findings, there is no basis for retaining this provision of the Final Judgment. As the Fifth Circuit held in *Castillo,* findings made in years past cannot constitute evidence that there are current and ongoing constitutional violations in the present. Thus, the court cannot rely on the 1980 findings to justify retaining relief because those findings do not relate to current and ongoing violations. Because the inmates did not carry their burden of proving an ongoing constitutional violation remedied by this provision of the Final

Judgment, Section III, Support Services Inmates, should be terminated.

## C. Discipline

■ Section IV of the Final Judgment addresses the disciplinary rules, procedures, and sanctions applicable to inmates and enjoins the Institutional Division as follows:

Defendants shall comply with their own rules regarding the discipline of prisoners. Defendants' current rules are the TDCJ–ID Disciplinary Rules and Procedures for Inmates, revised May, 1991. Only the Board of Criminal Justice shall have the discretion to alter these rules. All disciplinary hearings that may result in sanctions of solitary confinement or a loss of class or good time shall be tape recorded and the tape preserved and made available to the prisoner or his counsel substitute for review on request for six months after the hearings. Furthermore, defendants shall maintain in effect a staff counsel substitute program and shall ensure that prisoners assigned to solitary confinement receive the full daily rations of food [sic] and that all other prisoners receive, consistent with security requirements.

There is no evidence in the record to demonstrate that Section IV of the Final Judgment (1) "remains necessary to correct a current and ongoing violation of the Federal right," (2) "extends no further than necessary to correct the violation of the Federal right," and (3) "is narrowly drawn and the least intrusive means to correct the violation." The court made no findings after the 1999 hearing with regard

---

**25.** This section abolished the "building tender" system in which certain inmates were used as auxiliary guards to assist the civilian security forces in controlling prison units. This system had been established despite the existence of a Texas statute expressly prohibiting the use of inmates in a supervisory or administrative capacity over other inmates and forbidding any inmate to administer disciplinary action to another prisoner. *See* Tex. Gov't Code Ann. § 500.001 (2001) (previously codified at Tex.Rev.Civ.Stat.Ann. art. 6184K–1 (Vernon's Supp.1980)).

to inmate discipline. Moreover, Section IV and its requirements concerning disciplinary procedures do not address the three ongoing constitutional violations identified by the court.

Considering Section IV in light of the court's findings, there is no basis for retaining this provision of the Final Judgment. Because the inmates did not carry their burden of proving a current and ongoing constitutional violation remedied by this provision of the Final Judgment, Section IV, Discipline, should be terminated.

## D. Administrative Segregation

█ Section V.A.2 of the 1992 Final Judgment requires that "each prisoner assigned to administrative segregation shall be housed in a single occupancy cell." [26] There is no evidence in the record to demonstrate that Section V of the Final Judgment (1) "remains necessary to correct a current and ongoing violation of the Federal right," (2) "extends no further than necessary to correct the violation of the Federal right," and (3) "is narrowly drawn and the least intrusive means to correct the violation."

The current and ongoing constitutional violations regarding administrative segregation run to the conditions of confinement and the practice of using administrative segregation to house mentally ill inmates. None of the evidence presented at the 1999 hearing suggests that single-celling is necessary to remedy the identified constitutional violations on this issue. Further, it is undisputed that all administrative segregation inmates are currently housed in single occupancy cells. (Defs. Ex. 17 at 11790; Tr. at 867–68, 1758, 1902, 2740.) The current prospective relief is thus completely non-responsive to

the system's deficiencies in the area of administrative segregation. Section V, Administrative Segregation, should, therefore, be terminated.

## E. Use of Force

█ Section VII of the Final Judgment contains the following injunction with regard to the use of force in TDCJ–ID:

Defendants shall maintain and enforce written policies and procedures governing when and how force and chemical agents are permitted to be used by TDCJ–ID personnel against prisoners, reporting and internal investigation requirements when force is used or is alleged to have been used, and discipline of employees for violations of the policies and procedures. The policies and procedures shall require that only the minimum force and chemical agents reasonably believed to be necessary may be used, and shall establish reasonable policies, procedures, and standards for the effective investigation of prisoners' allegations of unnecessary or excessive uses of force and discipline of employees determined to have violated the policies and procedures. Only the Texas Board of Criminal Justice shall have discretion to alter the written policies and procedures. Until December 31, 1992, defendants shall notify the court and counsel for plaintiffs no less than 30 days in advance of any proposed substantive modification of the policies and procedures and the rationale for the modification.

There is sufficient evidence in the record to demonstrate that at least a portion of Section VII of the Final Judgment (1) "remains necessary to correct a current

---

**26.** This subsection is the only remaining relief concerning administrative segregation in the Final Judgment. The section's other obligations expired on December 31, 1992 pursuant to Section V.C of the Judgment.

and ongoing violation of the Federal right," (2) "extends no further than necessary to correct the violation of the Federal right," and (3) "is narrowly drawn and the least intrusive means to correct the violation." Accordingly, this section, as modified below, shall continue.

The current and ongoing Eighth Amendment violation of excessive use of force by officers in the TDCJ–ID facilities is well-detailed in the 1999 Memorandum Opinion. *See Ruiz*, 37 F.Supp.2d at 929–40. As noted therein, the "culture of sadistic and malicious violence" that continues to mark Texas's prisons has resulted in a system-wide prevalence of resorting to force more often and to a greater degree than necessary or constitutionally permitted. *Id.* at 929.

The parties agree that the TDCJ–ID policies governing use of force are adequate.[27] *Id.* at 919, 932. Plaintiffs' expert Allen Breed, for example, found that the TDCJ–ID policies and procedures governing the use of force are generally acceptable. *Id.* In his expert report, Gary DeLand, who testified for the defendants, concluded that "TDCJ–ID's policies, procedures, and practices generally meet or ex-

ceed ... appropriate correctional standards in the are of use of force against prisoners." *Id.* at 932. Further, the record shows that defendants are committed to maintaining written policies governing aspects of use of force. (Plfs. Mem. in Support of Proposed Form of J., p. 11.) Therefore, the portion of Section VII concerning the maintenance of policies shall be terminated, as it is no longer necessary to cure the constitutional violation.[28]

A clear connection has been made, however, between the violation of the plaintiffs' rights against excessive force and the generalized failure to implement and enforce TDCJ–ID's policies and procedures governing the use of force. The parties' experts agreed that it is imperative that correctional officers use force only as a last resort, not as a primary method of control or as punishment. *Ruiz*, 37 F.Supp.2d at 932–33. Yet the record establishes that this policy has not been implemented or enforced in TDCJ–ID's facilities. The evidence shows pervasive quick reliance on threat of force and force as a primary method of control and a failure by officers to use reasonable measures to try to avoid or minimize the use of force. *Id.*

---

**27.** The existing TDCJ–ID use of force policies prohibit unnecessary and excessive force by requiring that

[a]ll reasonable steps shall be taken to reduce and prevent any incident or necessity for the Use of Force. In a given situation, force is justified only when no reasonable alternative exists. When a situation requires the Use of Force, only the minimum force reasonably believed necessary shall be used. In no event shall force be used to impose discipline. Disciplinary sanctions for the violation of a TDCJ regulation or rule shall be imposed only pursuant to such disciplinary procedures (*Disciplinary Rules and Procedures for Offenders*) as now exist or may be established in the future.

(Defs. Ex. 24 at 11856.)

**28.** Despite the obligation imposed on The TDCJ–ID by this court to maintain policies

and procedures on when and how chemical agents are permitted to be used against inmates, it was found that The TDCJ–ID has failed to develop such policies regarding the use of pepper spray (or OC, for olio capsicum, gas). *See Ruiz*, 37 F.Supp.2d at 935. This oversight alone does not require the continuation of the maintenance provision. The constitutional problem identified by the court runs to the overuse and over dependence on the use of force-both physical and non-physical. The plaintiffs have included a separate provision in their proposed form of judgment governing the use and administration of chemical agents, however, it has not been demonstrated that policies specific to the use of chemical agents are necessary to correct the violation.

at 932–34. The record also demonstrates a pattern of punitive "uncalled for 'slamming,' hitting and kicking" of prisoners by officers. *Id.* at 929. Finally, it was shown that prison officials abdicate their responsibility in the area of supervision of use of force. *Id.* at 936–939.

To provide one example: although a violation of TDCJ–ID policy, the record shows several reported incidents where inmates were "struck by officer with first." *Id.* at 934. In one such confrontation, an officer hit a handcuffed inmate on the head with his closed fist after the inmate had spit in the officer's face. The prisoner fell to the floor face down; the officer was not disciplined.[29] *Id.* at 934. In another incident, a corrections officer was disciplined with only a one-day suspension and nine months of probation for kicking an inmate in the head while the inmate was lying on the ground in restraints. *Id.* at 934.

In the 1999 Memorandum Opinion, "an affirmative management strategy to permit the use of excessive force for both punishment and deterrence" was recognized. *Id.* at 940. "[W]hile the Internal Affairs Division goes through the motions of filing paperwork on cases, it seldom finds officer misconduct. The result is to send a clear message to line staff that excessive force will be tolerated." *Id.* Indeed, both plaintiffs' and defendants' experts and other witnesses attested that unless policies and procedures are carried out, they have no meaning. *Id.* at 932. Based on the evidence presented at the 1999 hearing and the findings contained in the Memorandum Opinion, it is found that a continued obligation to enforce existing TDCJ–ID policies and procedure on the use of force is necessary to correct the

current and ongoing constitutional violation.

Consistent with the above-made findings, Section VII will be amended to read:

Defendants shall enforce written policies and procedures governing when and how force and chemical agents are permitted to be used by TDCJ–ID personnel against prisoners, reporting and internal investigation requirements when force is used or is alleged to have been used, and discipline of employees for violations of the policies and procedures.

Section VII, as tailored, extends no further than necessary to correct the violation. First, as recognized in 1999, the problem is system-wide and requires a remedy equally broad in scope. *See id.* at 933. The Fifth Circuit has instructed, "[w]hether the data observed are sufficient to warrant a general conclusion must be determined by logic and judgment.... This kind of conclusion is not a mixed question of fact and law or one of legal inferences from the facts. It is instead one of the sufficiency of an evidentiary basis for a factual conclusion." *Ruiz v. Estelle,* 679 F.2d at 1133. Here, the conclusion of a system-wide violation as to use of force was based largely on the evidence provided by the expert witnesses who appeared in this action. Plaintiffs' expert Allen Breed visited 18 prisons, representing about 32% of the total inmate population of The TDCJ–ID, and each unit visit involved two to four days lasting between 12 to 14 hours each day. *Ruiz,* 37 F.Supp.2d at 929. His evaluation involved a review of written use of force reports, interviews of the inmates who were involved in the incident prompting the use of force report, and a review of related medi-

---

**29.** Defendants' witness Edward Ellis McElyea, chief of the administrative support bureau of the TDCJ Internal Affairs Division, testified that if an officer pushed an inmate into his cell hard enough to make him fall down and hit something, a violation of the use of force plan was likely, whether the inmate sustained injuries or not. *Id.* at 937.

cal files, if any. He also interviewed several inmates who had filed grievances or were listed on administrative segregation rosters and certain prisoners identified by the plaintiffs' counsel. *Id.* at 930. Plaintiffs' expert Chase Riveland toured and inspected 16 prisons, accounting for 25% of the inmate population. He reviewed the medical files and interviewed inmates in 155 use of force cases. *Id.* at 931. Finally, defendants' expert in this area, Gary DeLand, toured three units spending approximately two and a half hours at each facility, interviewed prison staff, and reviewed eight use of force reports. *Id.* Based on these assessments and the logic and judgment of the court, it was determined that the constitutional deficiencies identified are indeed present in the system at all levels.

The court is mindful that "systemwide injunctive relief may not be predicated on individual misconduct that 'is not part of a pattern of persistent and deliberate official policy,'" but "an institutional practice may be sufficiently prevalent to warrant such relief even though it is not embodied in regulations or imposed by official fiat." *Ruiz v. Estelle*, 679 F.2d 1115, 1154 (5th Cir.1982) (citations omitted), *opinion amended in part and vacated in part*, 688 F.2d 266 (5th Cir.1982), *cert. denied*, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983). Such an institutional practice has been identified. *See generally Ruiz*, 37 F.Supp.2d at 932–40.

The modified provision is also narrowly drawn and is the least intrusive means to correct the violation. The continuing obligation will only require The TDCJ–ID to

effectuate its self-designed and self-imposed commitments. The court cannot conceive of a less intrusive alternative, and neither party has proffered one.[30]

The portion of Section VII, Use of Force, requiring enforcement of defendants' own policies and procedures governing use of force meets the standards set forth in § 3626(b)(3) and shall continue. The remaining portion of this section shall terminate.

## F. Access to Courts

■ Section VIII of the Final Judgment was ostensibly designed to protect inmates' exercise of their right of access to the courts and enjoined the Institutional Division as follows:

Defendants shall maintain and enforce written policies and procedures permitting prisoners access to the courts, lawyers, and public officials and agencies and providing for investigations of allegations of retaliation for the exercise of such access. These policies and procedures shall be posted centrally in each prison and a copy shall be provided to each prisoner when the prisoner arrives in defendants' custody. Only the Texas Board of Criminal Justice shall have discretion to alter the policies and procedures.

After the 1999 hearing, the court made no findings regarding to access to courts. Section VIII and its requirements for the access to courts program relate in no way to the three ongoing constitutional violations identified by the court. Indeed, the court's March 1999 alternative order ex-

---

**30.** A similar remedial order was reviewed by the United States Court of Appeals for the District of Columbia Circuit in *Women Prisoners of the District of Columbia Department of Corrections v. District of Columbia*, 93 F.3d 910 (D.C.Cir.1996). There, the district court had ordered compliance with the Depart-

ment's established grievance procedures. The circuit court found that such obligation was not unduly intrusive since it did "not impose any new burdens on appellants; it simply requires appellants to observe their own policies and procedures in the running of their prisons." *Id.* at 931.

pressly states that, if the PLRA's termination provisions are upheld on appeal—as they now have been—"the PLRA renders inoperative certain sections of the Final Judgment entered herein in 1992, namely those sections pertaining to ... access to courts." (Order [Docket # 8892] at 3.)

There is no evidence in the record to demonstrate that Section VIII of the Final Judgment (1) "remains necessary to correct a current and ongoing violation of the Federal right," (2) "extends no further than necessary to correct the violation of the Federal right," and (3) "is narrowly drawn and the least intrusive means to correct the violation." Section VIII, Access to Courts, should, therefore, be terminated.

### G. Visits

■ The policies and procedures governing visitation were addressed in Section XII of the Final Judgment, which provided as follows:

> Except as provided herein, defendants shall be relieved of the operation of all extant orders, plans and stipulations with respect to visiting upon the court's final approval of this Final Judgment; provided, however, that defendants shall continue to maintain a contact visiting program.

Absent specific written findings regarding the continuing necessity of prospective relief in the area of visitation, it must be terminated. Based on the evidence adduced at the 1999 evidentiary hearing, the court found constitutional violations in the areas of inmate protection, use of force, and administrative segregation. No findings were made with regard to contact visitation or visitation generally. Moreover, Section XII and its requirement of a contact visiting program relate in no way to the three ongoing constitutional violations identified by the court. Even in the 1992 order approving the Final Judgment, it was acknowledged that this relief could not be constitutionally required. There is no evidence in the record to demonstrate that Section XII of the Final Judgment (1) "remains necessary to correct a current and ongoing violation of the Federal right," (2) "extends no further than necessary to correct the violation of the Federal right," and (3) "is narrowly drawn and the least intrusive means to correct the violation."

Considering Section XII in light of the court's findings, there is no basis for retaining this provision of the Final Judgment. Because Plaintiffs did not carry their burden of proving a current and ongoing constitutional violation necessarily remedied by this provision of the Final Judgment, Section XII, Visiting, should be terminated.

### H. Crowding

■ Section XIII of the Final Judgment, entitled "Crowding," is easily the longest and most detailed provision. Its general goal was to ensure that The TDCJ–ID would cease the unconstitutional practice, identified early in this civil action, of housing more inmates in areas than the areas were designed for, and housing inmates in areas that were not designed for housing at all. These former practices included operating prisons at 200% of their capacity, housing inmates in cell blocks occupied at double or triple their design capacity, assigning four or five inmates to a cell, and making inmates sleep on the floor.

To remedy these unconstitutional practices, Section XIII did several things. It set maximum inmate populations for the then-existing units. It placed requirements on how future units were to be built and how to calculate their maximum unit populations. It required future units to

provide approximately the same amount of housing space per inmate as the then-current units. It stated how the population limits change if parts of prisons are closed or renovated, or if permanent additions are made to existing prisons. It also prohibited The TDCJ–ID from housing inmates in tents or in areas that are not designed for housing, including runs, hallways, and converted day room and gymnasium space. In summary, Section XIII generally ordered The TDCJ–ID to house inmates only in areas designed for housing and in the way the housing areas are designed to be used. Section XIII was designed to ensure that The TDCJ–ID does not unconstitutionally overcrowd its prisons. Consequently, if The TDCJ–ID abides by the limitations in Section XIII, then The TDCJ–ID is not unconstitutionally overcrowded.

There is no evidence in the record to demonstrate that Section XIII of the Final Judgment (1) "remains necessary to correct a current and ongoing violation of the Federal right," (2) "extends no further than necessary to correct the violation of the Federal right," and (3) "is narrowly drawn and the least intrusive means to correct the violation." Overcrowding of Texas' prisons was not identified as a current constitutional problem in this court's 1999 Memorandum Opinion. Accordingly, provisions controlling population density in the prisons cannot be continued for that reason. Instead, plaintiffs argue that certain population caps are required to correct the identified violations concerning inmate safety. They seek to maintain Section XIII.B, which sets population caps at various units and a systemwide cap, and Section XII.D.1, which allows The TDCJ–ID to increase the systemwide population cap by building new units.

Plaintiffs' expert Chase Riveland acknowledged that the TDCJ–ID has complied with the letter and spirit of the population caps since 1992. (Tr. 853–54.) Therefore, to the extent that inmate safety is adversely affected by the current level of crowding, Section XIII does nothing to solve the problem. Moreover, the court made no findings that would necessitate the continuation of any of the crowding provisions in its 1999 Memorandum Opinion, and it cannot now do so. Even if the court accepts that the levels of violence and victimization it found to exist in the TDCJ–ID are a symptom of crowding, the court does not have the evidence before it that would show that the caps currently called for in the Final Judgment are appropriate and extend no further than necessary.

Considering Section XIII in light of the court's findings, there is no basis for retaining this provision of the Final Judgment. Because Plaintiffs did not carry their burden of proving a current and ongoing constitutional violation necessarily remedied by this provision of the Final Judgment, Section XIII, Crowding, should be terminated.

### I. Reporting; Monitoring by Plaintiffs' Counsel

Section XVI of the Final Judgment identifies defendants' reporting requirements and makes certain provisions for prison access and inmate meetings by plaintiffs' counsel for purposes of monitoring defendants' compliance with the continuing Final Judgment obligations. All terms of this section terminated on or before June 1, 1993, when plaintiff class counsel were relieved of all obligations. The plaintiffs have proposed that a slight modification of Section XVI.D be incorporated into the accompanying order regarding termination. Although the court reappointed legal counsel for the plaintiff class in 1996 to assist in the current proceed-

ings, the order reappointing counsel did not revive this section. Thus, any such remedial terms must be viewed as completely new relief, and available only if it meets the requirements of § 3626(a). Section XVI remains terminated.

### J. Defendants' Internal Monitoring

█ Section XVII of the Final Judgment served to ensure that the Institutional Division employed sufficient staff to keep up with the reporting and monitoring requirements mandated by other parts of the judgment. The Institutional Division was enjoined as follows:

> Defendants shall continue to employ an adequate number and type of staff, whether denominated as monitoring, auditing, administrative or other staff, at levels sufficient to ensure effective monitoring of all TDCJ–ID rules, regulations, policies and practices related to each area addressed by this Final Judgment.

To justify the retention of this administrative staffing requirement, it must be necessary to correct one of the three current and ongoing constitutional violations and also the least intrusive and most narrowly drawn means to achieve that end. There is no evidence in the record to demonstrate that Section XVII of the Final Judgment (1) "remains necessary to correct a current and ongoing violation of the Federal right," (2) "extends no further than necessary to correct the violation of the Federal right," and (3) "is narrowly drawn and the least intrusive means to correct the violation." The parties agree that this provision should be terminated.

While conceding that the provision as currently phrased is non-responsive to the ongoing and current constitutional violations, the plaintiffs advocate for modified relief in this area. (Plfs. Mem. in Support of Proposed Form of J., pp. 5–9.) They have grouped this administrative staffing

provision together with the correctional staffing provision in Section II of the Final Judgment and propose that both sections be replaced with a single obligation, that being: "Defendants shall employ sufficient trained staff to comply with this Order." (Plfs. Prop. Order upon Remand from Ct. of Appeals, ¶ 3.) The only remaining provision of the 1992 Final Judgment that will continue is the portion of Section VII requiring enforcement of TDCJ–ID policies governing the use of force. Inherent in this obligation is the employment of an adequate number of staff—administrative, security and non-security—to secure and ensure effective implementation and enforcement of those policies and procedures. Accordingly, an independent staffing requirement is unnecessary. Therefore, the court rejects plaintiffs' proposed modified relief on the issue of staffing. Section XVII, Defendants' Internal Monitoring, should be terminated.

### K. Health Services

█ Section XIX of the Final Judgment addressed the provision of medical and dental care to the inmates, specifically enjoining the Institutional Division as follows:

> A. Defendants shall comply with the provisions of the Consent Decree, April 20, 1981, pertaining to medical and dental care, and shall maintain a system for the delivery of medical and dental care and other health care services consistent with the provisions of the Comprehensive Medical Health Care Plan, as modified and approved, *Order on Defendants' Comprehensive Health Care Plan,* January 2, 1985; *Order Concerning Defendants' Psychiatric Services Plan and Comprehensive Health Care Plan,* January 3, 1986; *Stipulation and Order—Ac-*

*creditation of the Health System,* May 29, 1985.

B. No supplemental relief is ordered, provided that: (1) defendants shall carefully monitor the timeliness of access to unit health services (including medical, dental and psychiatric services) by walk-in and written sick call procedures; such monitoring shall measure access against the guidelines set forth in the "Discussion" of Standard P-35, *Standards for Health Services in Prison,* January 1987, National Commission on Correctional Health, unless the guidelines are revised, in which care the monitoring shall measure access against the revision; defendants promptly shall take corrective action on units that fail to afford access consistent with theses guideline, which corrective action may, if necessary, include reducing the number of prisoner population at units where no other steps succeed in bringing the unit into compliance with the sick call standards; provided, however, deviations from these guidelines which result from exercise of sound medical judgment shall not be deemed grounds for corrective action; (2) because TDCJ–ID has chronically had a severe shortage of nurses, defendants promptly shall take all steps legally available to them to offer competitive terms and conditions of employment and compensation to nurses and maximize their ability to attract nurses to accept employment and compensation to nurses and maximize their ability to attract nurses to accept employment; and (3) defendants shall continue developing the Health Services Patient Liaison Program, including the development of comprehensive policies and procedures for it, the assignment of sufficient staff to ensure that timely investigation of inquiries concerning the health care needs and treatment of individual prisoners and the notification to TDCJ–ID staff and prisoners of the function of the Patient Liaison Program.

\*　　\*　　\*　　\*　　\*　　\*

D. In the absence of a further order to the contrary, defendants shall be relieved of the operations of paragraphs XIX.A and B on December 31, 1992, except that defendants shall:

1. Obtain and maintain accreditation of all its unit health care and regional medical facilities with the National Commission on Correctional Health Care ("NCCHC") or a comparable and recognized accreditation organization.

2. Ensure that no prisoner is assigned to do work that is contraindicated for his or her medical condition.

3. Ensure full access to health care for all prisoners, regardless of segregation status.

4. Ensure that no nonmedical staff may countermand any medical order regarding a prisoner's treatment, work or other related circumstances.

5. Maintain health services (including medical, dental, rehabilitation and psychiatric) staffing and facilities that enable timely delivery of health care to all prisoners received into their custody, consistent with contemporary professional standards for correctional health care, and shall vigorously recruit for employment the required health services staff and take all reasonable steps to keep TDCJ–ID competitive in the recruitment of staff.

Sections XIX.A and XIX.B terminated on December 31, 1992, and the defendants

were relieved of all obligations under those provisions. Moreover, based on the evidence adduced at the 1999 evidentiary hearing, this court specifically found that the provision of health services in the Institutional Division meets constitutional standards. *Ruiz,* 37 F.Supp.2d at 892. There is no evidence in the record to demonstrate that Section XIX of the Final Judgment (1) "remains necessary to correct a current and ongoing violation of the Federal right," (2) "extends no further than necessary to correct the violation of the Federal right," and (3) "is narrowly drawn and the least intrusive means to correct the violation." Because Plaintiffs did not carry their burden of proving a current and ongoing constitutional violation necessarily remedied by this provision of the Final Judgment, Section XIX, Health Services, including the supplemental relief in Section XIX.D.1–.5, should be terminated.

### L. Death Row

▮ The final substantive section of the Final Judgment, Section XXI, mandated conditions on death row and enjoined the Institutional Division as follows:

> Defendants shall maintain a work and activity program for eligible death row prisoners and an activity program for death row segregation prisoners. Death row segregation prisoners shall be assigned to single occupancy cells. Defendants shall maintain an appropriate mix of single and double occupancy cells for work capable death row prisoners; provided that a death row work capable prisoner not assigned to a single cell may only be assigned to a double occu-

pancy cell that is no less than 80 square feet.

Absent specific written findings regarding the continuing necessity of this provision of the Final Judgment's grant of prospective relief, it must be terminated. Based on the evidence adduced at the 1999 evidentiary hearing, the court found constitutional violations in the areas of inmate protection, use of force, and administrative segregation. No findings were made with regard to the conditions on death row. Moreover, Section XXI and its requirements concerning death row relate in no way to the three ongoing constitutional violations identified by the court.

Considering Section XXI in light of the violations identified by the court, there is no basis for retaining this provision of the Final Judgment. There is no evidence in the record to demonstrate that Section XXI of the Final Judgment (1) "remains necessary to correct a current and ongoing violation of the Federal right," (2) "extends no further than necessary to correct the violation of the Federal right," and (3) "is narrowly drawn and the least intrusive means to correct the violation." Section XXI, Death Row, should, therefore, be terminated.

### V. PROPOSED MODIFICATIONS AND NEW PROSPECTIVE RELIEF

▮ As noted in the 1999 Memorandum Opinion, the scope of the evidentiary hearing and the review undertaken in the litigation involving the defendants' motions to terminate was limited to the eight substantive areas over which this court retains jurisdiction, those being: staffing, discipline, administrative segregation, use of force, access to courts, crowding, health services and death row.[31] Based exclusive-

---

31. Defendants continue to argue that the evidence accepted and considered by the court as the basis of evaluating the existence of ongoing constitutional violations ran beyond the scope of the 1992 Final Judgment. Despite their contentions, it was clearly determined that the adduced evidence was, in fact, limited to the confines of the Final Judgment

ly on the evidence presented at the hearing, three areas have been identified in which constitutional violations persist. The relief previously granted and embodied in the 1992 Final Judgment in large part fails to remedy these identified problems, as discussed in detail above. Accordingly, as the Fifth Circuit suggested in *Castillo,* it is appropriate for the court to consider modified or new relief. *See Castillo,* 238 F.3d at 357 ("[S]hould the existing relief be terminated for failure to meet the requirements of § 3626(b)(3), the plaintiffs are entitled to seek new prospective relief, but that relief must also meet the standards set forth in § 3626(a)."); *see also Gilmore v. People of the State of California,* 220 F.3d 987, 1008 (9th Cir. 2000) ("If the existing relief qualifies for termination under § 3626(b)(2), but there is a current and ongoing violation, the district court will have to modify the relief to meet the Act's standards.").

■ It is recognized that the defendants should be given "wide discretion within the bounds of constitutional requirements" to correct the identified violations not otherwise addressed by the continuing provision of the 1992 Final Judgment. *Lewis v. Casey,* 518 U.S. 343, 363, 116 S.Ct. 2174, 2179, 135 L.Ed.2d 606 (1996). Especially in light of the PLRA's requirement that any relief granted should be the least intrusive measure available, the defendants should be given the first opportunity to decide how they will accomplish the correction of the constitutional violation. *See id.* at 362–63, 116 S.Ct. 2174; 18 U.S.C. § 3626(a)(1)(A). Nevertheless, "the federal courts have the power, and the duty, to make their intervention effec-

tive." *Smith v. Sullivan,* 611 F.2d 1039, 1044 (5th Cir.1980).

The parties are encouraged to work together to craft remedial measures that will respond effectively to the identified constitutional violations and that will meet the standards set forth in § 3626(a)(1)(A). All attempts should be made to provide the court with a joint proposed remedial order that corrects the continuing injustices and establishes a time frame for final termination of the court's jurisdiction over the Texas prison system. During negotiations, the plaintiffs should bear in mind the principles of deference to the defendants discussed herein. However, it is noted that in the course of these remand proceedings, the plaintiffs have already contemplated and fashioned potential remedial measures. Without opining on their substance or ability to comport with the strict requirements of § 3626(a), it appears to the court that the plaintiffs' proposed form of judgment may be a possible starting point for discussions between the parties. The fact that the plaintiffs' submissions included a proposed termination of the court's jurisdiction on June 1, 2002, encourages the court that negotiations between the parties can be fruitful.

## VI. CONCLUSION

It was surmised when the court began its involvement with this civil action that the course would be long and arduous. Indeed, this civil action has become a history unto itself. Over the past twenty-nine years, the TDCJ–ID has vastly improved the system that at one point was incapable of description—the conditions so pernicious, and the inmates' pain and degradation so extensive. *See Ruiz v. Estelle,*

---

and those issues over which the court maintains jurisdiction. *Ruiz,* 37 F.Supp.2d at 871; *see also Ruiz v. Estelle,* 503 F.Supp. at 1390 ("Jurisdiction of this civil action will be re-

tained, until such time as the court determines that full and complete relief has been obtained for the plaintiff class.").

503 F.Supp. at 1390. Yet constitutional violations persist in the Texas prisons, as was determined by this court two years ago. In three major areas—conditions of confinement in administrative segregation, the failure to provide reasonable safety to inmates against assault and abuse, and the excessive use of force by correctional officers in Texas prisons—today's prisoners remain victims of an unconstitutional system. To the extent that the stipulated injunctive relief in the Final Judgment is responsive to these violations, it must be continued. New relief must also be fashioned to correct the continuing violations of the plaintiffs' constitutional rights. So long as these conditions persist, this civil action will remain alive.